Commonwealth *v.* Smith, Appellant.

322

Reargued November 23, 1964.   Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

re-argument refused April 14, 1965.

John B. Hannum, with him Peter Hearn, William T. Coleman, Jr., Robert W. Maris, Theodore O. Rogers, and Pepper, Hamilton and Scheetz, and Dilworth, Paxson, Kalish, Kohn & Dilks, for appellant.

Alfred Delduco, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 16, 1965:

So insignificant an event in the world of constitutional rights and liberties as the purchase of an ice cream cone on a summer's evening, set off, in this case, a chain of events which carried litigation into a court of quarter sessions, the Superior Court of Pennsylvania, the Supreme Court of Pennsylvania, the office of the Solicitor General of the United States, and the Supreme Court of the United States—and now into this Court again.

On the evening of August 8, 1960, E. Newbold Smith, a graduate of the U. S. Naval Academy, married and a father of three children, was driving his car northwardly on Route 202 in Thornbury Township, Chester County, when he stopped at a Dairy Queen stand to purchase the telltale cone. Munching on this confection he drove his car on to the adjacent property of a Sunoco gasoline station and then crossed over the medial strip of Route 202 to the northbound lane to resume his journey. The Chief of Police of Thornbury Township, Frank H. Elliott, who was in the gasoline station at the time, stated later that when Smith re-entered Route 202, he emerged in front of another car, forcing it over the center line. No collision occurred nor did any damage result from this traffic incident.

Elliott got into his police car to pursue Smith. It is not clear whether Smith knew that Elliott was following him, but when they both reached a point where

Route 202 intersects with Route 926, Elliott ordered Smith to pull over to the side of the road, which he did. What happened from then on depends upon whose story is to be accredited. Smith testified later that Elliott approached him angrily, demanding cards. Smith dropped his ice cream cone and reached into his inside pocket for his driver's card when Elliott struck him over the head with a blackjack. Stunned by astonishment as well as by the physical impact, Smith recoiled, but when he received "another crack on the head," he struck back at Elliott and they both fell to the ground, now striking at one another furiously, employing both feet and hands and interspersing their fistic and pedal fusillade with attempted chokings on one another.

Elliott, on his side, testified later that after he and Smith had parked their cars at the side of the road, he approached Smith, who was standing behind his car, and asked him for his driver's license and owner's card, holding in his own hand at the time a pad and pencil. Elliott said he saw Smith make a motion with his left hand "as though going toward the back of his trousers," and the next thing he knew he was on the ground, having been struck in the face over the left eye. While they were on the ground with Smith on top, Elliott reached up to seize Smith's necktie and attempted to twist it to shut off Smith's breath. He then kicked him in the stomach. At the height of the fistic, wrestling, kicking and strangling duel, two men from a nearby gasoline station ran up and separated the bleeding antagonists.

A West Chester police car took Elliott and Smith to the West Chester Police Station. Smith later charged that while at the police station he was severely beaten by three police officers, including Elliott, that he was denied medical attention and an oppor-

tunity to obtain counsel, being finally released the next morning at about 10 o'clock.

It is quite evident that both men were severely mauled in their roadside clash. It is equally evident that one or the other of them was justified in striking back, as a matter of self-defense, after the first blow had landed. Who struck the first blow? That is the crucial question in this case.

Smith complained to the United States Attorney for the Eastern District of Pennsylvania of the mistreatment he states he received at the West Chester Police Station. As a result, the involved police officers were indicted by a Federal grand jury under the Civil Rights Act, and are presently awaiting trial.

Smith was indicted by the Commonwealth of Pennsylvania in Chester County on seven bills, including assault and battery, the charges growing out of the altercation on the highway and the occurrences at the police station. At the trial which followed in Chester County, Smith was convicted of assault and battery but acquitted on all other indictments. He was sentenced to 30 days imprisonment and a $1000 fine. During the trial each side strove to prove that it was the opposing adversary who had precipitated the sanguinary bout. The stories told by the principals, Smith and Elliott, were irreconcilable.

It chanced that on the evening under discussion two ladies were riding in an automobile on Route 202 as the Smith-Elliott drama was unfolding, and they testified at the Chester County trial as to what they said they saw and heard. Mrs. Yvonne Corcoran, who was driving the car, said she saw Smith strike Elliott. Miss Elizabeth Sweet, who was a passenger in the car, testified she saw Smith strike Elliott to the ground and repeatedly punch him. Their testimony generally seemed to favor the position that Smith had been the aggressor in the pitched battle at the crossroads, al-

though some question could arise as to whether their view and their period of view encompassed all that occurred.

The day after the roadside fracas, Miss Sweet and Mrs. Corcoran gave statements at the West Chester police station as to their knowledge of the event. Over one month later, on September 21, 1960, the ladies gave statements to the FBI, which was investigating the charges made by Smith.

On January 11, 1961, the special agent in charge of the Philadelphia office of the Federal Bureau of Investigation (hereinafter referred to, for convenience, as the FBI) was served with what purported to be a subpoena duces tecum commanding him to appear at the Smith trial in West Chester and to bring with him: "Statements of all witnesses, diagrams, sketches and photographs taken in connection with investigation of incidents on Monday, August 8, 1960, at or about 9:00 p.m. and continuing thereafter in Thornbury Township and in the Borough of West Chester, Chester County, Pennsylvania, when peace officer Frank H. Elliott of Thornbury Township and police officers Harry Saltzman and Gordon W. Smith together with certain other West Chester Borough officers willfully subjected E. Newbold Smith of Warren Avenue, Paoli, Pennsylvania, to the deprivation of his rights, privileges and immunities secured and protected by the Constitution and the laws of the United States in violation of Title 18 U.S.C. Section 242. . . ."

On January 16, 1961, the date set for Smith's trial on the State charges, the special agent appeared before the Chester County court of quarter sessions, accompanied by an assistant United States attorney who moved to quash the subpoena on the grounds, inter alia, that the requested records pertained to a confidential investigation undertaken by the Department of Justice. At this point, it appeared that the subpoena had issued without the approval of the court of quarter

sessions, in violation of a Chester County rule of court. The court held: "Not limiting myself to . . . the rule of Court, I am going to allow the motion to quash."

On the following day, January 17th, Smith filed a petition formally requesting the court to issue a subpoena duces tecum for specific documents in the F.B.I.'s investigative file, paragraph 4 of the petition reading: "That your petitioner believes and therefore avers that included in said report are signed statements of Yvonne Corcoran and Betty Sweet, alleged eyewitnesses to some of said events of August 8, 1960, who have categorically refused to discuss what they saw with your petitioner or his representatives, although they have freely given statements to the prosecutors herein."

The court denied the petition, stating that "the information sought for is being made available to the defendant by the District Attorney." The "information" referred to consisted of the statements made by Sweet and Corcoran at the police station. After Miss Sweet had testified in full and Mrs. Corcoran had testified on direct, but not in cross-examination, defendant's counsel renewed his application for a subpoena duces tecum requiring the production of the F.B.I.'s file in the matter, "particularly with reference to the statements given by these ladies." The court denied the motion, stating it would not consider its previous ruling.

Smith was convicted and he appealed to the Superior Court, which affirmed the conviction. This Court granted allocatur because of the defendant's contention that he had been denied due process when he was refused the F.B.I. statements for use at his trial.

After hearing argument on the appeal this Court decided by a vote of 5 to 1,[1] that the defendant was not

---

[1] Mr. Chief Justice BELL did not sit in view of the fact that one of his kinsmen had testified at the trial in West Chester.

entitled to inspect the FBI, Corcoran and Sweet statements. Justice O'BRIEN dissented, and in his dissenting opinion stated that the defendant's rights had been constitutionally prejudiced by the refusal of the court below to direct the issuance of the requested subpoena on the FBI.

The defendant petitioned the Supreme Court of the United States for a writ of certiorari and on March 4, 1964, the Supreme Court granted the writ, stating: "In response to an inquiry from this Court, the Solicitor General has indicated that the claim of confidential privilege was concerned solely with the initial broad-based demand for virtually the entire FBI file on the matter and that the Department of Justice was not informed of, and did not refuse to comply with, the subsequent specific requests for statements given by the two witnesses. We grant the petition for a writ of certiorari and remand the case to the Supreme Court of Pennsylvania, for reconsideration of petitioner's claim in light of the representation of the Solicitor General."

In his memorandum to the Supreme Court of the United States, the Solicitor General stated: "At no time has a request for a particular document in the FBI file been presented to any federal officer. The only demand with which the federal government has been confronted has been, as noted, the original blanket demand for practically the entire contents of a voluminous file relating to an ongoing investigation—a demand as to which the Department properly asserted privilege in the motion to quash the defense's subpoena. The Department has never been requested to consider whether, *in the interests of justice,* the information contained in either Miss Sweet's or Mrs. Corcoran's statement to the FBI should be made available to the court and counsel in the Pennsylvania prosecution." (Emphasis supplied).

It must be obvious from this statement that it is the Solicitor General's view that if the interests of justice require that Smith be allowed to examine the Sweet and Corcoran statements, the Department will interpose no objection on the ground of security. Certainly there would have been no point in the Solicitor General's having made this observation if the facts did not warrant a release of the Sweet-Corcoran statements for the defendant's use at a trial involving his name, reputation and liberty.

This Court, after the case had been remanded to us by the Supreme Court of the United States, ordered a reargument, and at the hearing, the District Attorney of Chester County, speaking in behalf of the Commonwealth, reasserted his opposition to a new trial, arguing Smith had no right to or need for the statements in controversy.

To the contrary, Smith had the right to, and great need for, the statements he requested. The 6th Amendment to the Constitution of the United States guarantees to the accused the right "to have compulsory process for obtaining Witnesses in his favor, and to have the Assistance of Counsel for his defense."[2] While this amendment is directed to federal criminal prosecutions, the Supreme Court of the United States held in *Gideon v. Wainwright*, 372 U.S. 335, that that part of the 6th Amendment requiring assistance of counsel is binding on the States. Since the process sought to be here invoked had to do with documents in possession of the Federal government, the 6th Amendment would apply, and a refusal to comply with the mandate would amount to denial of due process guaranteed under the 14th Amendment.

In *Jencks v. U. S.*, 353 U.S. 657, the defendant asked for court process to compel the FBI to make

---

[2] Of course, Article I, §9 of the Pennsylvania Constitution is equally applicable.

available to him reports made on him by certain witnesses who now testified against him. The trial court refused to issue such an order. The Supreme Court reversed, declaring: "The petitioner was entitled to an order directing the government to produce for inspection all reports of Matusow and Ford in its possession, written and, when orally made, as recorded by the FBI, touching the events and activities as to which they testified at the trial."[3]

Recent decisions of the Supreme Court of the United States demonstrate unmistakenly an expansion of the frontiers of due process to include not only what is ipsissimis verbis spelled out in statutes and constitutional provisions but to "advance in its standards of what is deemed reasonable and right." *Wolf v. Colorado*, 338 U.S. 25, 27. In that case, Justice FRANKFURTER said: "Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society . . . It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights."

While our system of government is that of a federated republic with each state exercising full sovereign powers, except on such subjects where authority has been delegated to the national government, the people of the United States enjoy the fullest protection of

---

[3] It would indeed be incongruous to allow inspection of FBI documents to a person charged with membership in the Communist Party and impeding production "to slow down the Korean War effort," where security was involved, as was true in the *Jencks* case, and to deny FBI documents to a citizen not charged with any crime against the United States, as is true in the instant case.

the United States Constitution in the basic citizenship rights, regardless of state boundaries. The preamble of the United States Constitution reads: "We the people," and not, "We, the States." The United States Supreme Court has been giving increasing expression to these basic rights of citizenship. For instance, in the case of *Burns v. Ohio*, 360 U.S. 252, 258, the defendant was denied an appeal to the Supreme Court of Ohio because he did not have funds with which to pay the docket fee. The Supreme Court of the United States reprehended the deprivation with the statement: "The imposition by the State of financial barriers restricting the availability of appellate review for indigent criminal defendants has no place in our heritage of Equal Justice Under Law."

In discussing convictions in State courts on forced confessions, Chief Justice WARREN said in *Spano v. New York*, 360 U.S. 315, 321: "Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in *protecting fundamental rights of our citizenry*, including that portion of our citizenry suspected of crime." (Emphasis supplied).

In *Sherman v. United States*, 356 U.S. 369, 380, Justice FRANKFURTER observed that the federal courts "have an obligation to set their face against enforcement of the law by lawless means or means that *violate rationally vindicated standards of justice* . . . Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake." (Emphasis supplied).

Certainly the State courts have no less an obligation. The area of Federal-State relationship has become a subject of augmenting study in the courts and it is clear for everyone to see that the towering walls which at one time separated federal from state guaran-

tees are being methodically lowered, where "fundamental rights of our citizens" are involved. If the case at bar were being tried in a federal court, there can be no question that the FBI statements here under focal attention would be supplied to the defendant and they would be used at the trial. Nor can there be any surmise that if the Sweet and Corcoran statements had been collected by the Pennsylvania State Police, this Court would order the State Police to surrender the statements to the defendant for his trial in the State court. With this irrefutable premise, it can only be a paradox beyond compare to say that, because this case adds up the guarantees of both Federal and State governments, that the total is less than the individual parts; that while Smith would be allowed federal documents in a federal court and state documents in a state court, he cannot, with both the Federal and State governments looking on, obtain a federal document to use in a state court, where his basic constitutional rights, both Federal and State, are involved. The law sometimes take illogical turns, but this Court could not permit anything so illogical and so fundamentally unfair to take lodgment in the State Reports of this Commonwealth.

The most elementary principles of what "is deemed reasonable and right" dictate that Smith be allowed to see what witnesses have previously said to the government about him when they testify against him in court. It is simply unthinkable that in a goverment of the people, the government should withhold from one of the people evidence which could prove him innocent of a crime against all the people.

As already stated, the crucial question in this case, so far as even-handed justice is concerned, the justice which makes one proud of courthouses and the law, is: Who struck the first blow on the night of August 8th—Smith or Elliott? Who was the aggressor? Who

ruptured the peace and dignity of the Commonwealth by applying brute force when the law dictates peaceable means and methods? The answer to this query determines whether the defendant Smith's life is to be stigmatized with a criminal conviction, in addition to being deprived of his liberty for another 27 days,[4] or whether he is to be cleared and return to a life of peace and good order, to which some forty witnesses testified he was habituated.

Every possible sliver of light which can be shed on this question of the first blow should be welcome, if not indeed invited and demanded. In the case of *United States v. Baldi*, 195 F. 2d, 815, the Commonwealth failed to produce in evidence a statement made by a witness to the effect that the defendant Almeida did not fire the fatal shot. The Commonwealth argued that since, in a robbery-murder, every participant in the robbery would be guilty of murder, it did not matter whether or not Almeida's finger pulled the revolver trigger which caused the victim's death. The United States Circuit Court of Appeals, with Chief Judge BIGGS speaking, held that it was a denial of due process for Almeida not to have had access to the statement in question: "We are of the opinion that the suppression of it [the statement] uncorrectable on appeal since it was not in the record, did cause the Commonwealth to overreach Almeida and to deprive him of due process of law."

It cannot be disputed that if, in their statements to the FBI, Miss Sweet and Mrs. Corcoran said that Smith was not the aggressor, or if they said they did not know whether he was the aggressor, this type of a declaration would have considerable effect on the jury in their determining who struck the first blow in the Route 202 fight. Thus, denying Smith the op-

---

[4] He had served 3 days when supersedeas intervened.

portunity to use such statements would unquestionably be a denial of "fundamental rights of our citizenry." But even if the FBI statements corroborate generally what Sweet and Corcoran said or may say at a new trial, as to the details of the physical combat between Smith and Elliott, but differ from the witnesses' courtroom testimony on minor points, such differences can be the subject for consideration of the believability to assign to the witnesses. The question of credibility sometimes depends on the slightest inclination of the scales. Where the jury is in doubt as to whether or not to believe a witness, the smallest feather of a palpable exaggeration or an inconsistency in a witness's statement on a minor point may be the very item to tip the scales and discredit the witness on his main testimony.[5]

In *Brady v. Maryland,* 373 U.S. 83, 87, the Supreme Court declared: "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

In *United States v. Maroney,* 319 F. 2d 622, the defendant Butler was tried for murder in the courts of Allegheny County. He was convicted and sentenced to death. After his conviction he learned that an eye witness to the fatal shooting (Diehl) had made a state-

---

[5] In the historic case of *United States v. Burr,* 25 Fed. Cas. 187, 191, the defendant asked for the production of a certain letter. The government opposed. Chief Justice MARSHALL ordered the production, saying: "Let it be supposed that the letter may not contain anything respecting the person now before the court. Still it may respect a witness material in the case, and become important by bearing on his testimony. Different representations may have been made by that witness, or his conduct may have been such as to affect his testimony. In various modes a paper may bear upon the case, although before the case be opened its particular application cannot be perceived by the judge. . ."

ment on the details of the crime, which statement was in possession of the district attorney but was not referred to at the trial. On appeal from a refusal of a writ of habeas corpus in the United States District Court of Western Pennsylvania, the Circuit Court of Appeal, Judge GANEY speaking, held: "Had counsel for the appellant known of Diehl's statement, cross-examination might have revealed, with this in mind, many factors helpful to the appellant's case, challenging, if not materially weakening, Diehl's account of the fatal firing of the shot which might have resulted in appellant's conviction of a lesser degree of crime . . . This withholding by the Commonwealth of information impinging on a vital area in appellant's defense is a denial of the Due Process Clause of the 14th Amendment of the Constitution."

Since Miss Sweet and Mrs. Corcoran did not personally know Smith and Elliott prior to August 8, 1960, it could be assumed that they are neutral witnesses. But they could be as neutral as the sun and the moon, and still be in error. The defendant should have every opportunity to determine their reliability as witnesses. Did they see the acrimonious conflict from beginning to end? Was the motion picture of the historic struggle in progress when they took their seats as spectators? Did any physical obstructions intervene to impede their view of all that transpired?

They testified in court. Did they ever make any statements contrary to what they asserted in court? The Commonwealth argues that the defendant had an opportunity to determine whether Sweet and Corcoran were reliable witnesses since the defendant was allowed to see the statements the women had made at the police station, and defendant's counsel cross-examined them on those statements. But these were not the only out-of-court statements made by the witnesses. If an accusing witness tells one story in Cleveland and another

in Detroit, it does not satisfy constitutional requirements to tell the defendant he has no right to the Detroit statement since he saw the Cleveland statement.

It could well be that the FBI statements differ from the police station statements because a witness could perhaps be a little more reserved, a little more cautious, and a little more precise in relating what he saw and heard, when he is being questioned by agents of the United States Government than when he is giving a statement at a police station.

Nor is there any rule, as the Commonwealth seems to believe there is, that one must show that a witness's previous statement contradicts what is testified to or may be testified at the trial, before the prior statement may be demanded. As Justice O'Brien said in his dissenting opinion when this case was before us the first time: "The rule requiring the turning over of statements touching on the testimony of a witness does not require the laying of a foundation of inconsistency; all that is required is a showing that a report was made, touching upon the matter testified to at trial. The fact that similar statements were made available to the defense should not deprive appellant of his right to the statements in question."[6]

The Commonwealth then argues that if it was error to exclude the FBI statements, this was a harmless error, but *was* it harmless error? In support of the "harmless" theory, the Commonwealth cites *In Re Rosenberg v. United States*, 360 U.S. 367, where the Supreme Court held that it was not reversible error for the Government to refuse to turn over to the defendant a letter written by a witness to the FBI. The Court pointed out that the information which was in the possession of the FBI was already in possession of the defense and that, although it was wrong not to turn

---

[6] *Jencks*, 353 U.S. 666.

over the letter, it was harmless error because the defendant was not deprived of any information not already known to him. Here the situation is wholly different. As Justice O'BRIEN said: "Here there is a report which might contain things other than contained in the District Attorney's reports."

However, apart from the paramount injustice involved in denying to an accused person documents which could show him innocent of an act, conviction of which will deprive him of his liberty, it is violative of logic and fundamental common sense for the Commonwealth to insist that the FBI statements and the Police Station statements are the same when it does not know, and cannot know, what the FBI statements say. Justice is always pictured with bandaged eyes, but the blindfold should be removed when constitutional rights demand certainty and not speculation, truth and not guesswork, fact and not conjecture. Why speculate as to what the FBI statements say? Why refuse to turn a key which will unlock the mystery as to what the FBI statements contain, especially when the FBI has no objection to releasing them?

Another bent arrow of argumentation which the Commonwealth inserts in its disabled bow of criminal law theory is that the FBI statements can have no bearing on the Smith indictment for assault and battery since "what followed at the police station had nothing to do with the instant case." This is a non sequitur. The statements made by Sweet and Corcoran cover what occurred in the assault and battery episode, as no one pretends that they had any knowledge as to what happened to Smith after he had been lodged in the West Chester Police Station. Thus, the FBI statements are bound to be informative to the defendant on the issue so vital to a determination of the criminal prosecution against Smith, namely, Who struck the first blow?

The Commonwealth admits that there was a discrepancy between what one of the witnesses said at the trial and what she said at the police station as to who struck that first blow. If the police station statement contradicts the courtroom testimony, it could be that the FBI statement will further contradict that witness. The Commonwealth may not, on the basis of what happened at the trial, because of statements not in dispute, contend that other statements, of which it can have no knowledge, will be of no benefit to the defendant.

Moreover, the duty of a district attorney is to see to it that justice is done and not merely to obtain convictions.[7] He is a quasi-judicial officer and thus, to that extent, may not, in a judicial impartiality, refuse to look at and appraise evidence which may point to innocence of the accused defendant or at least offer additional information in determining whether a miscarriage of justice may not have occurred.

It would be most unfair to allow a state prosecutor to block the obtaining of FBI statements by the simple assertion that the defendant can get information elsewhere. With such reasoning, the state prosecutor could always deny the defendant an FBI statement by handing him an innocuous assertion made by the witness at some other time and place, where there were no safeguards taken for truth-telling.[8]

The Commonwealth then recommends that if the case is to be remanded to the Chester County courts,

---

[7] The interest of the United States in a criminal prosecution ". . . is not that it shall win a case, but that justice shall be done . . ." *Berger v. United States*, 295 U.S. 78, 88, cited in *Jencks*, supra, 668.

[8] In *Commonwealth v. Neill*, 362 Pa. 507, 520, Chief Justice MAXEY said: "Of course, if he [the district attorney] should discover some fact which would militate in the defendant's favor it would be his moral and legal duty to bring this to the jury's attention."

it not be sent back for a new trial but only for a hearing to determine if the Attorney General of the United States will assert the privilege of nondisclosure, and, if the FBI statements are released, the trial court is merely to "make a determination as to whether their contents were consistent with that supplied by the District Attorney. Appellant would then have the right to appeal any adverse decision."

This would be a prolongation of a journey already terminated. The Supreme Court of the United States has spoken.[9] Why build a track over the marshlands of interlocutory procedures when the final station built on the bedrock of a definitive decision has been reached? The Solicitor General has said quite clearly that "no question of federal privilege or of the consequences of the assertion of a federal privilege is involved" and that "the United States has no official interest in the case."

The Supreme Court of the United States has practically laid down the law of the case. Denying Smith the FBI reports at the first trial constituted a denial of due process and the only possible manner to remedy that infirmity, inherent in the first trial, is to order a new trial so that the defendant may have what the Supreme Court has indicated he could have had at the first trial had the request been properly made. If Smith is to have the statements they can be of no value to him except to use them at a trial in an attempt to prove his innocence of the crime charged against him.

Fortuitous error, like a perverse shadow, has accompanied this case from the beginning. Defendant's counsel's original subpoena duces tecum asked for

---

[9] The Supreme Court of the United States said in *Jencks v. United States*, 353 U.S. 657, 669: "The practice of producing government documents to the trial judge for his determination of relevancy and materiality, without hearing the accused, is disapproved."

more than the FBI could furnish or the defendant needed. The Government refused to supply the omnibus file, stating, through the assistant United States attorney, that security was involved. Although the trial court quashed that first subpoena for an additional reason, namely, it had issued without the court's approval, it was taken for granted that the FBI would not honor any request for statements resulting from the event of August 8, 1960. In fact, in its opinion denying a new trial the trial court said that the Attorney General had not waived the confidential nature of the files and that "therefore, the disclosure of the information contained in the files of the Federal Bureau of Investigation, which are not in the true sense public records, cannot be compelled by this Court, when the public official in charge of such information states it is confidential in nature."

When the defendant appealed to this court for a new trial, this Court said that it was the FBI, and not the Commonwealth, which denied appellant access to the information in question.

The Solicitor General's memorandum on the subject has now untangled the skein of error, misunderstanding and misapprehension, it has clarified the atmosphere, and it has swept away all the nonessentials in the case by stating definitively and specifically that the FBI did not refuse to supply the statements of Sweet and Corcoran and indicating quite clearly that if request is properly made it will not refuse to supply such statements. While the Solicitor General and the Supreme Court of the United States would not naturally enter into the merits of the evidence, it is quite clear that legal authority of this magnitude would not devote time and consideration to something de minimis. It would not be stretching logic to the extreme, or interpretation beyond the apparent, to assume that the federal reviewing authority regards the

defendant's rights as having been depreciated in the proceedings which have gone before, without ascribing fault to any court or official. A new trial would restore to the defendant what would have been his at the first trial, if unwanted but persistent Error had not overshadowed the proceedings.

It is difficult to understand, therefore, why, in view of the explicit utterances of the Solicitor General and the decision of the Supreme Court of the United States, the Commonwealth should resist a new trial when the errors which have gone before and now brought so conspicuously to light, dictate a new trial to the end that constitutional rights will be respected, the law will be vindicated, and the truth, to the extent that it can be ascertained through trial procedure, will be known.

Judgment of sentence reversed and case remanded for new trial consistent with this opinion, specifically indicating that, upon proper request therefor, the court authorize the issuance of subpoena duces tecum for statements made by Miss Sweet and Mrs. Corcoran to the FBI.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I agree that defendant is entitled to and should be awarded a new trial and in this result I fully concur.

I am, however, unable to agree that a new trial should be granted on constitutional grounds.[1] Two members of this Court proceed on the theory that grave and significant constitutional questions are involved here. In my view, all that is actually involved is simply a procedural and evidentiary issue, although an important one.

———

[1] Only Mr. Justice MUSMANNO and Mr. Justice O'BRIEN place the grant of a new trial on constitutional grounds.

Current authority seems to indicate that *Jencks v. United States,* 353 U.S. 657, 77 S. Ct. 1007 (1957), rested on the supervisory power of the Supreme Court of the United States over federal court trial practice and that in *Jencks* the Supreme Court was laying down a rule based on that power. *Palermo v. United States,* 360 U.S. 343, 345, 362-63, 79 S. Ct. 1217, 1221, 1229-30 (1959).[2]

Nowhere in *Jencks* is there mentioned any constitutional provision or deprivation. What the Supreme Court was doing there, was what this Court does with routine frequency in our analogous state role: deciding how and whether production of relevant documents should be made available at trial.

I have no doubt that this Court has the supervisory power to say that it is the best practice for the courts of this Commonwealth to compel disclosure of pertinent statements in the hands of Commonwealth officials. See *Commonwealth v. Caplan,* 411 Pa. 563, 568, 192 A. 2d 894, 896 (1963). Nor do I entertain any doubt that under *some* circumstances, state refusal to disclose, or refusal to attempt to obtain disclosure of, vital information may amount to a trial which is not fair within constitutional concepts of due process of law.

But all this is quite different from saying that constitutional requisites of due process always demand such disclosure. It is also drastically different from concluding that our courts may and must obtain such disclosure, at the risk of unconstitutionally denying a fair trial, when the pertinent statements are in the hands of federal officials. Weighty consequences would attach to imparting the concept of constitutional imperatives presented in the other opinion which an-

---

[2] But see Mr. Justice BRENNAN's concurring opinion, joined in by Chief Justice WARREN and Justices BLACK and DOUGLAS, id. at 362-63, 79 S. Ct. at 1229-30.

nounces our result. For example, the federal government, for valid reasons of privilege, can always refuse to disclose statements in its possession. I also have little doubt that, even beyond questions of privilege, the federal government could refuse to reveal, in state court proceedings, material in its possession. Out of comity, no doubt, these instances may be seldom, but the fact—legitimate power to refuse—remains. If I understand the other view expressed in support of the grant of a new trial, its effect is that if the federal government refused to comply with a request for statements, a fair trial in a state court cannot be constitutionally had, and the defendant must go untried. I think such a holding would go beyond what is necessary and, more importantly, beyond what is wise and sound. If Mr. Justice BRENNAN is correct in his belief that the *Jencks* case also has a constitutional premise,[3] then, in my view, the state, at the most, would be compelled to do its best to obtain the documents in question. If it does this, yet fails, then due process will not be violated.

I think this Court should first determine, in its supervisory capacity as this Commonwealth's highest court, whether it believes that the state should attempt to make the statements in question available. If we answer that question in the affirmative and conclude that the trial judge erred in his refusal to make the statements available, then no constitutional question need be reached.[4]

---

[3] See *Palermo v. United States*, 360 U.S. 343, 360, 362-63, 79 S. Ct. 1217, 1228, 1229-30 (1959).

[4] The statement by the Solicitor General and the remand by the Supreme Court of the United States seem to have elicited undue conclusions. As I interpret it, the remand means only this: If the Commonwealth denied to the defendant the opportunity to see statements pertinent to the accused's defense, when it was within the power of the state to effect the disclosure, then the question of whether such refusal amounts to a constitutional denial of due

Did the trial court err when it passed upon defendant's application for inspection of the two statements in question? I believe the statements should have been made available if pertinent.

The court, during the trial, refused defendant's request for the opportunity to have produced for his inspection, examination and possible trial use, statements of two Commonwealth witnesses given to the Federal Bureau of Investigation.[5] The only reason assigned by the court for its ruling was "that the information sought . . . is being made available to the defendant by the District Attorney." The trial court undoubtedly was motivated by the assumption that the statements given to the FBI and to the district attorney were identical. In the absence of such proof that the statements were identical, the defendant should not have been precluded from examining the similarities and differences, if any, in the statements. The court, no doubt, was also influenced by the earlier appearance of representatives of the FBI who asserted that the requested FBI file (which included the statements) was regarded as confidential and not subject to state subpoena. It was not until after trial, appeal and de-

___

process would be squarely before the Supreme Court. In this case, however, as the case stood before the Supreme Court of the United States, it was unclear whether the state had realized that no federal privilege was being claimed. In such a posture, it would be difficult, if not impossible, to determine whether there had been a denial of due process. If, with knowledge that no privilege was being claimed, we decide that the statements should be seen by the defendant, no constitutional question would confront the Supreme Court. Thus, the case was remanded to us seemingly for the purpose of making clear this Commonwealth's position.

[5] As I read the record, the last request by defendant's counsel for the documents in question was sufficiently specific. Moreover, counsel for the Commonwealth admitted on oral argument before this Court that, whatever the state of the record, the request was made quite specific at side bar.

cision by this Court, when this matter came before the Supreme Court of the United States, that the Solicitor General indicated that the federal government would likely not claim privilege for these two statements and indicated that upon proper request the statements would probably be made available to our courts.

Since almost everyone in the chain of circumstances from the inception of the effort to secure the statements has apparently been confused, the trial court included, I would grant a new trial in the interests of justice—and not on constitutional grounds. Despite the previously created confusion, the granting of a new trial should now clarify the issues and procedures involving the two questioned statements. If the defendant proceeds by subpoena duces tecum, the trial court, upon compliance with its local rules, should issue the subpoena. Once produced, the statements should then be inspected by the court to determine whether they are relevant and admissible. If so, the statements should be made available to the defendant.

Mr. Justice JONES and Mr. Justice EAGEN join in this opinion.

———

DISSENTING OPINION BY MR. JUSTICE COHEN:

After handing down our opinion in this matter, 412 Pa. 1, the Supreme Court of the United States granted certiorari and remanded this case to us for reconsideration in light of the representation made to the Court by the Solicitor General of the United States. In reconsidering in accordance with the mandate of the Supreme Court of the United States, I shall review the history of this litigation.

Defendant, E. Newbold Smith, was indicted in 1960 for assaulting a police officer. The incident took place on a public highway and was viewed by two women, Yvonne Corcoran and Elizabeth Sweet, who were driving by the scene in Mrs. Corcoran's car.

Smith admitted the fight but claimed that the police officer was the instigator. *He also filed a complaint with the U. S. Justice Department asserting that his civil rights had been violated during his subsequent detention at the police station.* The F.B.I. investigated the complaint and an indictment was brought in Federal court against the police officers.

Prior to Smith's trial on the assault charge defense counsel had a subpoena duces tecum issued upon the F.B.I. commanding the production of "[s]tatements of all witnesses, diagrams, sketches and photographs taken in connection with investigation of incidents on Monday, August 8, 1960. . . ." At trial, James Kelley, an assistant United States attorney, appeared with an official of F.B.I. and made the following statement: "Mr. Kelley: This is an investigation by the United States Government and is confidential, and it is the position of the United States Government that the person served was the improper person to be served, and furthermore that this is a violation of the security of the office of the Department of Justice, and accordingly, Your Honor, I move that this subpoena be quashed."

The trial judge quashed the subpoena, setting forth as another reason for his action the failure of defense counsel to comply with a local court rule to the effect that no subpoena for a public record should be issued without the special permission of the court. The Solicitor General of the United States in his memorandum to the United States Supreme Court concerning this action on the part of the lower court said: "The subpoena served on the Philadelphia special agent in charge of this case, which the State court quashed . . . called for the production of '[s]tatements of all witnesses, diagrams, sketches and photographs taken in connection with [the F.B.I.'s investigation of the incidents in question]'. There was no request for, or

reference to, any specific document or paper in the file. Neither of the two women (Mrs. Corcoran and Miss Sweet) whose names figured in the subsequent discussions and events (after the federal government's connection with the case had terminated) was mentioned. The subpoena was simply a broad-based demand for virtually the entire contents of an F.B.I. file on a matter which the Department had currently under investigation.

"It was for this reason that the Department resisted the subpoena as violative of the confidentiality of executive records in a matter still in live status. For the same reason, we believe that the State court's order . . . granting Assistant United States Attorney Kelley's motion to quash the subpoena was correct— wholly apart from the additional and independent ground on which the court declared the subopena invalid, viz., counsel's failure to comply with the local rule of court prohibiting the issuance of a subpoena duces tecum for a public record or paper without the special order of a judge."

In an effort, presumably, to meet the requirement of the local court on the day following the quashing of the subpoena, defense counsel filed a formal petition with the court to subpoena the F.B.I. records—

"The petition of E. Newbold Smith

"Respectfully Represents:

"1. That he is defendant in the above cases in which he is charged with Assault and Battery, Aggravated Assault and Battery and Obstructing an Officer in the Execution of Process.

"2. That your petitioner's counsel have heretofore had issued and served a subpoena duces tecum on the special agent in charge of the Federal Bureau of Investigation of Philadelphia requiring him to produce at petitioner's trial the records of an investigation into the facts and circumstances surrounding cer-

tain events of the night of August 8, 1960. Said investigation has been made at the instance of the petitioner, who contends he had been denied civil rights.

"3. In response to said subpoena said Special Officer appeared January 16, 1961 as required but did not have with him said desired records but had with him one James Kelly, Esquire, Assistant United States Attorney who moved to quash the subpoena on the grounds inter alia that the information contained in the desired report was confidential to the Bureau and not available to others than the Bureau.

"4. That your petitioner believes and therefore avers that included in said report are signed statements of Yvonne Cochrane and Betty Sweet, alleged eye witnesses to some of said events of August 8, 1960, who have categorically refused to discuss what they saw with your petitioner or his representatives, although they have freely given statements to the prosecutors herein.

"5. That in quashing said subpoena your Honor cited among other reasons, though not as controlling, the following local rule: 'Subpoena Duces Tecum. Section 1. No subpoena duces tecum for a public record or paper shall be issued without the special order of the Judge.'

"6. Your petitioner is advised and avers that it is important to his defense to have the aforementioned records and reports available at his trial.

"Wherefore, your petitioner prays your Honorable Court to make a Special Order authorizing the issuance of a subpoena duces tecum in the form now in the records of this case.

"And he will ever pray.

E. Newbold Smith"

This petition was denied.

At the trial, Mrs. Corcoran and Miss Sweet testified that they saw defendant Smith strike the first blow

of the altercation. In an attempt to impeach Miss Sweet's testimony, defense counsel confronted her with her statement made to the district attorney in which she apparently indicated that she did not see the inception of the fight but was rather alerted to it by a declaration of Mrs. Corcoran. Miss Sweet attempted to reconcile this apparent inconsistency on the stand.

Defense counsel then orally renewed its application for a subpoena of the F.B.I. investigation file. The record reveals the following colloquy: "Mr. Rogers (defense counsel): If Your Honor please, I would like to renew the application that we made for a subpoena duces tecum to produce the Federal Bureau of Investigation File of the examination of this matter, particularly with reference to the statement given by these ladies. There is, I believe, a discrepancy between the statement and her testimony here, I am reasonably certain that there is a discrepancy between the statement given to the Federal Bureau of Investigation and that in the possession of the District Attorney.

"The Court: What is the nature of the discrepancy?

"Mr. Hannum (defense counsel): Maybe I should speak, the discrepancy as I understand it is in the statement of Miss Elizabeth Sweet, and it is my belief that her testimony or her statement to the FBI does not include any observation of who struck the first blow whereas today she states that Mr. Smith did."

The trial judge refused to reconsider his earlier ruling and again denied the request.

The jury found defendant guilty of simple assault and battery and he was fined $1,000 and sentenced to 30 days imprisonment. Defendant's motion for new trial was denied and his conviction was affirmed by the Superior Court (198 Pa. Superior Ct. 499). We granted allocatur because of defendant's claim that

the action of the trial court conflicted with the decision of the Supreme Court of the United States in *Jencks v. United States,* 353 U.S. 657 (1957). In our decision affirming the conviction (412 Pa. 1), we set forth two independent grounds: (1) that, contrary to the situation in *Jencks,* the prosecution was not responsible for the unavailability of the alleged impeaching reports since it was the F.B.I., a third party to the prosecution, which had refused to produce the requested material, see *People v. Parham,* 384 P. 2d 1001, 1003 (1963) (TRAYNOR, J.); (2) that even if an error had been committed no prejudice resulted to the defendant because, on the basis of defendant's representation as to what he hoped to obtain from the F.B.I. investigation file (See colloquy, supra), the desired impeaching information had already been made available by the district attorney. It is true, however, that the majority in the first opinion failed to distinguish between the initial catch-all demand for a subpoena, which was properly refused by the lower court and the two additional requests for a subpoena which also were refused by the court.

After our denial of defendant's petition for reargument, defendant petitioned the Supreme Court of the United States for a writ of certiorari. In granting the petition, the Supreme Court stated: "In response to an inquiry from this Court, the Solicitor General has indicated that the claim of confidential privilege was concerned solely with the initial broad-based demand for virtually the entire FBI file on the matter and that the Department of Justice was not informed of, and did not refuse to comply with the subsequent specific requests for statements given by the two witnesses.

"We grant the petition for a writ of certiorari and remand the case to the Supreme Court of Pennsylvania, for reconsideration of petitioner's claim in light of the representation of the Solicitor General."

It is clear that the Supreme Court of the United States and the Solicitor General of the United States considered the action of the lower court proper in denying the initial catch-all request of the defendant. I agree. It would be manifestly inappropriate to hold that a state trial court erred when it quashed a subpoena for F.B.I. records after the U. S. Attorney has stated to the court that it would not be obeyed and when no citation for contempt may issue because of such disobedience. See *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). See also The Jencks Right: Judicial and Legislative Modification, The States and the Future, 50 Virginia Law Review, 535, 550 (1964). The issue for present determination, therefor, is whether the denial of the two *subsequent* requests for a subpoena constituted such a violation of defendant's rights that the grant of a new trial is required. In so defining the issue I am guided, at the United States Supreme Court's suggestion, by the Memorandum of the Solicitor General of the United States. He says: "The only demand with which the federal government has been confronted has been, as noted, the original blanket demand for practically the entire contents of a voluminous file relating to an ongoing investigation—a demand as to which the Department properly asserted privilege in the motion to quash the defense's subpoena. The Department has never been requested to consider whether, in the interests of justice, the information contained in either Miss Sweet's or Mrs. Cochrane's statement to the F.B.I. should be made available to the court and counsel in the Pennsylvania prosecution.

"The issues presented, therefore, would seem to be: (1) whether the trial court erred in denying a subpoena for specific documents which would have called upon the federal government to decide whether to furnish prior statements by witnesses in a State prose-

cution; (2) whether counsel distinguished between his initial catch-all demand and subsequent request with sufficient clarity to present the question to the trial court; and (3) whether the error, if any, was harmless, . . . . Since no question of federal privilege or of the consequences of the assertion of a federal privilege is involved, the United States has no official interest in the case."

The second suggested issue, namely, whether counsel distinguished his subsequent requests for a subpoena from his initial catch-all demand *with sufficient clarity to present the question* to the trial court of whether it should issue a subpoena for specific documents which would have called upon the federal government to decide whether to furnish only the statements by witnesses Corcoran and Sweet, is clearly the pivotal issue. If counsel did not so distinguish then the Commonwealth cannot be considered to have denied defendant any right. Rather, the trial court merely refused to issue a subpoena of a type which had properly been quashed before when the U. S. Attorney indicated that the federal government did not intend to comply.

The crucial determination can be made only by reading the record, pertinent parts of which are set forth in the first part of this opinion. First, the original catch-all subpoena duces tecum which was issued, and which was properly quashed by the trial court, commanded the production of F.B.I. reports showing "[s]tatements of all witnesses, diagrams, sketches and photographs taken in connection with investigation of incidents on Monday, August 8, 1960 . . . ." Second, the subsequent petition for a subpoena, while it indicates in paragraph 4 that the F.B.I. reports contain statements of the two witnesses, does not distinguish, in its request, between the materials sought by it and the materials sought by the subpoena previously is-

sued and properly quashed. The petition prays for the "issuance of a subpoena duces tecum in the form now in the records of this case," i.e., the catch-all subpoena quoted above. Third, the final request for a subpoena, made orally at trial, was "to renew the application that we made . . . to produce the Federal Bureau of Investigation file of an examination of this matter particularly with reference to the statement given by these ladies." Nowhere in this record do I see a clear, unequivocal request for the statements given by Miss Sweet and Mrs. Corcoran alone. In fact, each of the subsequent requests demands the entire records and files of the F.B.I. in the matter—a demand with which the U. S. Attorney had already indicated noncompliance.

In light of the Solicitor General's Memorandum, I do not comprehend how a majority of this Court failed to perceive the pivotal issue. If the issue had been perceived and the record studied a majority surely would have concluded that it was unnecessary to decide any other question; no right having been asserted by defendant, none could have been denied. Assuming, however, that a majority had addressed itself to the pivotal question and concluded, differently than I have, that the second or third requests for a subpoena was sufficiently limited, the next question logically would seem to be whether the trial court's refusal was reversible error. This would depend upon whether or not the error was "harmless", a question which we have confronted on numerous occasions. While the answer may not always be easy we have never had so much difficulty, as we have had here, in perceiving the question. More specifically, the matter involves a question of exclusion of evidence. If the defendant had actually had possession of the statements made to the F.B.I. by witnesses Corcoran and Sweet and had attempted to introduce them into evidence at the trial

would the exclusion by the trial court have been "harmless" error under the circumstances? If we would hold that it was not "harmless" error we would also have to hold that a refusal to subpoena such evidence was not "harmless" error. Accordingly, we would order a new trial. (Of course, if the trial court knew for a fact that the F.B.I. would not obey a *properly limited request* it would not even be error to refuse to issue the subpoena because it could not compel the F.B.I. to obey. See *Touhy,* supra. It need not take a useless action which can produce nothing but embarrassment.) I shall not discuss my opinion on whether the assumed error was "harmless" or not because the answer is not relevant to my view of the case.

While I am surprised at the failure of a majority to perceive and dispose one way or the other of the pivotal question, I am completely bewildered by the undue and confusing consideration given to *Jencks v. U. S.,* 353 U. S. 657 (1957) and the Sixth and Fourteenth Amendments to the Federal Constitution. The import of the former, even if we assume it had due process overtones, was the United States Supreme Court's holding that, in the interest of fair play, if the federal prosecutor refused to supply properly requested evidence in a federal prosecution it would be required to drop the prosecution. Here, the prosecution, i.e., the Commonwealth, is not refusing to supply anything. True, in *Jencks* it was also held that the federal trial judge *must issue* the properly requested subpoena but we do not need *Jencks* to gauge the propriety of the trial judge's refusal here. The standard to be applied is that of "harmless" or "harmful" error. As to the Sixth Amendment, I am not aware that it contains a right and duty which is both applicable to the trial of the issue before us and imposed upon the states by virtue of its inclusion in the Fourteenth Amendment. At

least, the late Mr. Justice FRANKFURTER, in an article published immediately before his death, did not indicate that any such part of the Sixth Amendment has been carried over to the due process clause. See Frankfurter, Memorandum on 'Incorporation' of the Bill of Rights Into the Due Process Clause of the Fourteenth Amendment, 78 Harv. L. Rev. 746, 760-764 (1965). Moreover, why should this Court address itself to the commands of the federal constitution before it directs its attention to its own constitutional mandates? Article I, §9 thereof provides: "In all criminal prosecutions the accused hath a right to be heard . . . [and] to have compulsory process for obtaining witnesses in his favor. . . ."

Again, I will not discuss whether in a case which properly presents the issue this clause would require the issuance of a subpoena under present circumstances.

Unfortunately, this Court has not produced an opinion which authoritatively informs the losing litigant why it lost or which authoritatively sets forth legal principles to be resorted to as precedent in future litigation. Only the result commands a majority. It would have been far better if a majority had decided that defense counsel's second or third request for a subpoena was properly limited and that, in the circumstances, the trial judge's refusal to issue such subpoena was "harmful" error. Instead we have an unauthoritative variety of unclear expressions on important issues which we need not have reached.

In my view defense counsel's failure—whether knowing or simply inept—to request a subpoena properly limited in scope is dispositive. Accordingly, I would affirm.