591 A.2d 1095

**COMMONWEALTH of Pennsylvania**

v.

**Wilfredo SANTIAGO, Appellant.**

Superior Court of Pennsylvania.

Argued May 31, 1990.

Filed May 30, 1991.

58

60

David Rudovsky, Philadelphia, for appellant.

Laurie Magid, Asst. Dist. Atty., Philadelphia, for Com.

Before ROWLEY, WIEAND, OLSZEWSKI, MONTEMURO, BECK, KELLY, POPOVICH, JOHNSON and FORD ELLIOTT, JJ.

KELLY, Judge:

The defendant, Wilfredo Santiago, appeals a life sentence imposed following his conviction of first degree murder involving the assassination of Philadelphia Police Officer Thomas Trench. We reverse and remand for a new trial.

Santiago raises five contentions on appeal. Only two require discussion in this opinion.[1]

---

1. Because the remaining three alleged errors neither present novel issues of law nor could be repeated on retrial, we need not address

First, Santiago contends that his fifth amendment right to counsel was violated when police reinitiated questioning outside the presence of counsel, after counsel had been requested and provided. In light of the United States Supreme Court's recent decision in *Minnick v. Mississippi,* —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), we are constrained to agree. We cannot agree with the prosecution that error in this regard was harmless.

Secondly, and as an independently sufficient basis to require a new trial, Santiago contends that the trial court violated his due process rights when that court failed to disclose evidence to the defense which the trial court acquired during an interview with a key witness held *in camera,* outside the presence of both defense counsel and the prosecutor, when it became apparent during the course of the trial that the evidence was materially exculpatory. We agree that the trial court had a duty to disclose the evidence, that the issue was not waived and that the undisclosed evidence was sufficiently exculpatory to require a new trial.

Taken separately each error requires a new trial. Their combined effect is doubly compelling. Our reasoning follows.

## I. FACTS AND PROCEDURAL HISTORY

On May 28, 1985, at approximately 3:00 a.m., 43 year old Police Officer Thomas Trench was found by his District Patrol Sergeant parked in his police cruiser with the motor running and the headlights on at the corner of 17th and Spring Garden Streets in Philadelphia. As the supervisor approached, he observed that the window of the driver's door to the squad car was down and that Officer Trench was slumped over the steering wheel with his hands in a relaxed position, and his gun still in its holster. Believing it highly improbable that the eleven year veteran officer had

them. *See Kremer v. Janet Fleisher Gallery, Inc.,* 320 Pa.Super. 384, 392, 467 A.2d 377, 381 (1983) (*en banc*).

fallen asleep on duty, the Ninth District Patrol Sergeant investigated further only to find Officer Trench's eyes wide open with dried blood on his face. Closer examination revealed that Officer Trench had been shot at close range once in the face and once in the back of the neck, and was dead. With no clues to the motive or identity of the assassin immediately apparent, Officer Trench's supervisor radioed the call that an officer was down, and an intensive hunt for the assassin began.

Although for the next several weeks Philadelphia police would bring into custody and question numerous members of the community in the Spring Garden section of the city,[2] some of the most valuable clues in the search for the man who would ultimately be tried and convicted of the slaying came from the fruits of questioning and investigation in the hours immediately after the murder was discovered. In that brief period, homicide detectives learned, *inter alia:* that one man had allegedly been carrying a gun during a street fight which occurred seven hours before the murder and only four blocks away from the murder scene; that the same man had been arrested for his involvement in the street fight by a police officer assigned to the same patrol car in which Officer Trench was later found murdered;[3] and, that the same man, upon his release that night from custody, had allegedly vowed revenge upon the police for

**2.** The search was later held invalid in an order in which the Honorable Clarence Newcomer of the United States District Court, Eastern District of Pennsylvania noted:

This case sadly brought to mind a famous line from the well-known movie Casablanca: 'Major Strasser's been shot. Round up the usual suspects.' In the movies, the face is humorous and draws chuckles. In this case, I believe the line is appropriate but devoid of any humor.

*Spring Garden United Neighbors, et al. v. City of Philadelphia,* 614 F.Supp. 1350, 1354 (E.D.Pa.1985).

**3.** Evidence introduced at trial established that the ill-fated police car prominently bore the call numbers "912." N.T. 7/15/86 at 14 ("[W]e have the number 912 twice in the front hood of the car. We had it on the side fender, the front fender, and we have it on the rear trunk area, and we had large lettered numbers on top of the vehicle.").

his arrest. That man is appellant, Wilfredo Santiago.[4]

As the evidence mounted of Santiago's involvement in the street fight seven hours before the murder of Officer Trench, police re-arrested the then twenty-one year old Santiago on the afternoon of May 28, 1985, on charges related to the street fight.[5] At the police station, he was read his *Miranda* rights and was told that the police wished to question him about his knowledge of or involvement in the murder. On each of three occasions that May 28, 1985 afternoon, Santiago waived his *Miranda* rights and provided statements in which he denied any knowledge of or participation in the murder of Officer Trench. Before the last of this series of questioning, Santiago requested the aid of a lawyer. Although one was not afforded him at that time, counsel was provided for Santiago that evening at his arraignment in which he was formally charged with assault and terroristic threats in connection with the street fight.[6] Because he was unable to post bail set at $75,000,[7] Santiago was remanded to custody and has remained in custody since that time.

On June 11, 1985, police transported Santiago from his jail cell to the Police Administration Building pursuant to a warrant on further charges relating to his involvement in the street fight. Once there, he was again read his *Miranda* rights and asked by police if he wished to speak with them. Despite the advice of counsel appointed to represent him during the arraignment, Santiago agreed, waived his *Miranda* rights, and offered several statements. Likewise, on June 27, 1985, Santiago was again brought from his cell

4. The record reveals that although Santiago was on parole for robbery at the time of this arrest, he was released the same night apparently because Santiago had successfully given police an alias to avoid having a detainer lodged against him, and because the police had insufficient evidence at that time to hold him.

5. The record reveals that the street fight occurred between 7:15 and 7:45 p.m. Santiago had been arrested at approximately 8:15 and later released at 10:30 p.m.

6. We note that Santiago was later tried and acquitted of these charges.

7. Bail guidelines for the instant charges suggest bail at $1,000–$5,000. *See* Philadelphia Municipal Court Bail Guidelines Judicial Worksheet.

64

to the Police Administration Building where he once again waived his *Miranda* rights and agreed to questioning about the killing of Officer Trench. In each of these interviews, Santiago remained consistent in his denial of any involvement in the murder. During this final set of interrogations, however, Santiago admitted having possessed, but having sold two weeks before the murder, a .38 calibre handgun. On July 23, 1985, with the knowledge that Officer Trench had been shot with a .38 calibre gun, police charged Wilfredo Santiago with murder and possession of an instrument of crime.

Subsequently, the emotionally evocative nature of the events, intense pre-trial publicity, and inflamed segments of the public prompted the Commonwealth to seek and obtain a pre-trial protective order sealing all probable cause and wiretap affidavits based on the threat that public access to such information would pose to potential trial witnesses.[8] Thereafter, because public tension continued to mount, the Commonwealth requested the protective order be continued until trial. On April 23, 1986, the trial court ordered the probable cause and wiretap affidavits remain sealed, except as to defense counsel.

Philadelphia Newspapers Incorporated (PNI) then petitioned to intervene to object to the protective order. The trial court granted the petition and PNI argued that there was insufficient record evidence to support a finding of potential witness coercion. In response, the trial court held a series of *in camera* conferences with several potential witnesses in which each was placed under oath, offered assurances of confidentiality and court protection, and questioned only in the presence of a court reporter and the trial judge himself. Both the prosecutor and counsel for the defense were excluded from the *in camera* proceedings but

8. *See, e.g.,* "Man framed in slaying, leaders say," Philadelphia Inquirer, 2/21/86 at 5–B; "Misuse of subpoenas is alleged," Philadelphia Inquirer, 3/6/86 at 1–B; "To trial: The Trench controversy resumes," Philadelphia Inquirer, 4/15/86 at 1–B; "Legal systems facing trial—tensions mount in case of Wilfredo Santiago," Philadelphia Daily News, 4/21/86.

were informed that the *in camera* testimony had been transcribed. At the end of these proceedings, the trial court found that a substantial potential for witness coercion existed, and continued the protective order.

Defense counsel thereafter brought a pre-trial motion to suppress all of the statements made by Santiago during the time he was in custody. The motion was denied.

On July 14, 1986, Santiago was brought to trial before a jury and was found guilty of murder in the first degree and possession of an instrument of crime. The jury later fixed the penalty at life imprisonment.

More than a year later, on October 19, 1987, an *en banc* panel of the Philadelphia Common Pleas Court was convened to hear post-verdict motions. On June 23, 1988, the court denied post-verdict motions and Santiago was formally sentenced to life imprisonment for murder, and a concurrent term of 2½ to 5 years imprisonment for possession of an instrument of crime.

An unsuccessful appeal to a panel of this Court followed. A timely motion for reargument *en banc* was later granted by this Court on March 12, 1990.

## II. RIGHT TO COUNSEL

Santiago contends his fifth amendment right to counsel under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was violated. The Commonwealth replies that no violation occurred and that any error was harmless. We find that Santiago's constitutional rights were violated and that the error in admitting poisoned fruits of the violations was not harmless.

### A. *MINNICK v. STATE OF MISSISSIPPI*

On appeal, Santiago first contends that the trial court erred in failing to suppress the statements obtained from him in jail following his request to speak with counsel. Santiago argues that under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), such statements

were taken in violation of his fifth amendment right to counsel. In view of the United States Supreme Court's most recent interpretation of the fifth amendment right to counsel, we are constrained to agree.

On December 3, 1990, the United States Supreme Court handed down its decision in *Minnick v. Mississippi, supra.*[9] There, in overturning a double murder conviction based in part on a confession obtained outside the presence of counsel after the defendant had requested and consulted with counsel,[10] the Supreme Court explained the bright line "prophylactic" rule originally announced in *Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723, as follows:

> In *Miranda v. Arizona* [384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 723 (1966)], we indicated that once an individual in custody invokes his right to counsel, interrogation "must cease until an attorney is present"; at that point, "the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Edwards* gave force to these admonitions, finding it "inconsistent with *Miranda*

**9.** We note that neither the police involved in interviewing Santiago after his arrest in 1985, nor the original panel of this Court which affirmed judgment of sentence on December 29, 1989, had the benefit of the Supreme Court's definitive guidance as to the precise contours of the right to counsel espoused in *Minnick v. Mississippi, supra.*

**10.** The relevant facts in *Minnick v. Mississippi, supra,* may be briefly summarized as follows. Minnick, a Mississippi prison escapee, was arrested and held in California on charges that he and a fellow escapee killed two men who unexpectedly interrupted them while burglarizing a mobile home near the prison in Mississippi, and thereafter dragged their bodies into a nearby gully. On a Friday, two FBI agents read Minnick his rights and sought to interview him regarding the charges. Minnick waived his rights and spoke to the agents briefly before he cut the interview short, directing them to return only after he had retained an attorney. Minnick then consulted with an attorney who advised him to invoke his privilege to remain silent at any subsequent encounter with the police. On the following Monday, a deputy sheriff came to Minnick's cell and reread Minnick his rights. Thereafter, outside the presence of counsel, Minnick confessed to his involvement in the crimes. Minnick was thereafter extradited to Mississippi, found guilty of two counts of murder, and sentenced to death.

and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." 451 U.S. at 485, 101 S.Ct. at 1885. We held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.*, at 484, 101 S.Ct. at 1884–1885. Further, an accused who requests an attorney, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*, at 484–485, 101 S.Ct. at 1885.

\* \* \* \* \* \*

Our emphasis on counsel's *presence* at interrogation is not unique to *Edwards*. It derives from *Miranda*, where we said that in the case before us "[t]he presence of counsel ... would be the adequate protective device necessary to make the process of police interrogation conform to the dictates of the [Fifth Amendment] privilege. His presence would insure that statements made in the government-established atmosphere are not the product of compulsion." 384 U.S. at 466, 86 S.Ct. at 1623. *See Fare v. Michael C.,* [442 U.S. 707] at 719, 99 S.Ct. [2560] at 2568, [61 L.Ed.2d 197 (1979)]. Our cases following *Edwards* have interpreted the decision to mean that the authorities may not initiate questioning of the accused in counsel's absence. Writing for a plurality of the Court, for instance, then-JUSTICE REHNQUIST described the holding of *Edwards* to be "that subsequent incriminating statements made *without [Edwards'] attorney present* violated the rights secured to the defendant by the Fifth and Fourteenth Amendments to the United States Constitution." *Oregon v. Bradshaw,* 462 U.S. 1039, 1043, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983) (emphasis added).

*See also Arizona v. Roberson*, [486 U.S. 675] at 680, 108 S.Ct. [2093] at 2097, [100 L.Ed.2d 704 (1988)] ("The rule of the *Edwards* case came as a corollary to *Miranda's* admonition that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present' "); *Shea v. Louisiana*, 470 U.S. 51, 52, 105 S.Ct. 1065, 1066, 84 L.Ed.2d 38 (1985) ("In *Edwards v. Arizona*, ... This Court ruled that a criminal defendant's rights under the Fifth and Fourteenth Amendments were violated by the use of his confession obtained by police-instigated interrogation—without counsel present—after he requested an attorney"). These descriptions of *Edwards'* holding are consistent with our statement that "[p]reserving the integrity of an accused's choice to communicate with police only through counsel is the essence of *Edwards* and its progeny." *Patterson v. Illinois*, 487 U.S. 285, 291, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988). In our view, a fair reading of *Edwards* and subsequent cases demonstrates that we have interpreted the rule to bar police-initiated interrogation unless the accused has counsel with him at the time of questioning. *Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.*

*Minnick v. State of Mississippi, supra*, —— U.S. at ——, 111 S.Ct. at 490–491, 112 L.Ed.2d at 495–96, 497–98 (emphasis added and supplied). *Minnick's* broad holding controls here.

All told, Santiago was questioned on five separate occasions. The first two interviews, which occurred in the afternoon following the murder, on May 28, 1985, were prefaced with warnings to Santiago that he had a right to remain silent which he could invoke at any time during the questioning, that anything he said could be used against him, that he had a right to consult with an attorney and that if he could not afford one, the court would appoint one

for him, as required by *Miranda v. Arizona, supra.* On the first two occasions, Santiago chose to waive these rights and answered police questions, denying any involvement in the murder both times. No violation is alleged or may be found during either of the first two interrogations.

■ Before the third interview, however, Santiago chose to exercise one of his rights by requesting to talk to an attorney.[11] Thereafter, the police waited for roughly an hour and then asked Santiago if he wished to speak with them again. As before, Santiago was read his *Miranda* rights, chose to waive them, and systematically denied any involvement in the murder of Officer Trench. Counsel, however, was not provided until that night at the arraignment. At that time, his lawyer advised him not to again waive his right to remain silent.

After having been formally charged with crimes relating to the street fight, Santiago remained in jail. Two weeks

11. We note that although the trial court found as a matter of fact that "[a]t the conclusion of [the second] interview, [Santiago] requested an attorney," *see* Suppression Motion Opinion at 3, the Commonwealth contends that the request was insufficient. Our review of the record reveals that the detective who interviewed Santiago testified on direct examination that Santiago said in this regard, "maybe ... I should talk to an attorney now or something." N.T. 4/24/86 at 60. On cross-examination, however, the detective acknowledged that in his written report following the interview, he wrote that Santiago "*demanded* that he talk to a lawyer," and on recross-examination, the detective re-characterized Santiago's statement to reflect that Santiago said he "*should* talk to a lawyer." N.T. 4/24/86 at 61–62 (emphasis added). Under the totality of the circumstances, *i.e.* the request was made immediately after having been twice questioned by police about the murder of a fellow officer and informed that he had failed a polygraph test performed during the second set of questioning, *id.* at 19, 60–61, we are not persuaded that Santiago's request was too ambiguous for the trial court to properly find that Santiago had requested an attorney. *See Commonwealth v. Zook,* 520 Pa. 210, 216, 553 A.2d 920, 923 (1989) (holding that under the totality of the circumstances the statement, "Can I use the phone to call my mother to see if she can get me an attorney?" clearly invoked the right under *Miranda* to secure counsel). As the trial court's finding of fact is supported by the record, we are neither empowered nor inclined to disturb it. *See Commonwealth v. Hubble,* 509 Pa. 497, 504 n. 4, 504 A.2d 168, 171 n. 4, *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986); *Commonwealth v. Stein,* 369 Pa.Super. 409, 535 A.2d 616 (1987).

later, on June 11, 1985, the police approached him for the fourth time and once more reminded him of his rights. Without his lawyer present (and in spite of his lawyer's earlier advice), Santiago again waived his rights and responded to their questions.

On June 27, 1985, the police approached Santiago for the fifth time and, as they had each time previously, reminded him of his rights. Armed with new evidence this time, the police challenged Santiago's previous accounts. As before, Santiago waived his rights and answered their questions, without his lawyer present.

 As the United States Supreme Court has now made clear, once Santiago had requested counsel, he had invoked his fifth amendment right to have counsel *present* during all police initiated interrogation at *any point* after that request and before formal accusation of that crime.[12]

---

**12.** Under the federal Constitution, after formal accusation, a "suspect" becomes an "accused," and sixth amendment rights attach. *See Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Pennsylvania, however, has held that such rights attach after arrest. *See Commonwealth v. Karash,* 513 Pa. 6, 518 A.2d 537 (1986). Here, because Santiago had not been formally arrested or charged with *murder* until after the relevant statements had been made, his sixth amendment rights are not at issue under either constitution. *See Maine v. Moulton, supra; Commonwealth v. Karash, supra* (holding that sixth amendment right to counsel did not attach to defendant in confrontations involving "bringing-up" defendant from holding facility to police station for interrogation where defendant was not arrested and charged with additional crime until *after* confrontations occurred). The fact that Santiago had been arrested and formally charged with crimes relating to the *street fight* does not affect our analysis. *See Illinois v. Perkins,* —— U.S. ——, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).

Moreover, to the extent that the Commonwealth argues that Santiago's request for an attorney pertained only to the assault and terroristic threats charges (not the murder charge), because Santiago had originally been re-arrested for his involvement in the street fight only, we note that such a distinction is unavailing. In *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988), the Supreme Court held, *inter alia,* that a request for counsel on one charge effectively invokes the fifth amendment right of counsel to be present during interrogation regarding all other, even unrelated charges, while the suspect remains in custody. *Id.* 486 U.S. at 682, 108 S.Ct. at 2098. Thus, even assuming that Santiago requested counsel to aid him only with regard to the charges relating to the street fight, under

Neither the fact that Santiago was properly informed and repeatedly reminded of his fifth amendment right to remain silent, nor the fact that counsel was provided and (unsuccessfully) advised Santiago to invoke his *Miranda* right to remain silent, nor even the fact that Santiago chose to waive his right to remain silent, is of any consequence in the wake of *Minnick v. Mississippi, supra.* Proof that counsel had been requested, that the police had reinitiated questioning thereafter, and that counsel was not actually *present* during any such interrogation, dispositively establishes that the fifth amendment right to counsel as currently expounded by the Supreme Court was violated.[13] *See Minnick v. Mississippi, supra.* Accordingly, we are compelled to hold that the statements offered during Santiago's third, fourth, and fifth sets of interrogations were obtained unconstitutionally and that they were erroneously admitted at trial.

## B. HARMLESS ERROR

The Commonwealth argues alternatively that Santiago is not entitled to a new trial because the error in admitting the statements at trial was harmless. In part, we agree. However, we find reversible error as to some of the evidence improperly admitted.

▉▉▉ Constitutional errors do not necessarily compel the award of a new trial; errors, even with regard to fundamental constitutional rights, may be deemed harmless where they effect no real impact on the ultimate disposition of a particular case. *See Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54

*Roberson* the request would no less effectively invoke his right of counsel to be present during interviews regarding the murder as well.

**13.** To the extent that a panel of this Court has previously held to the contrary in *Commonwealth v. Santiago,* 376 Pa.Super. 54, 545 A.2d 316 (1988), that decision is hereby expressly overruled, on the basis of *Minnick v. Mississippi, supra.*

L.Ed.2d 424 (1977); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986); *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978); *Commonwealth v. Yabor,* 376 Pa.Super. 356, 546 A.2d 67 (1988). Rather, as both our Supreme Court and the United States Supreme Court have made clear, an otherwise valid conviction will not be set aside if, after reviewing the record as a whole, a court finds the error to have been harmless. *See Delaware v. Van Arsdall, supra,* 475 U.S. at 681, 106 S.Ct. at 1436; *Commonwealth v. Story, supra,* 476 Pa. at 405, 407, 383 A.2d 155. Error is harmless if the Commonwealth proves beyond a reasonable doubt that there is no reasonable possibility the error contributed to the verdict. *See Commonwealth v. Bricker,* 525 Pa. 362, 375, 581 A.2d 147, 153 (1990); *Commonwealth v. Williams,* 524 Pa. 404, 407–409, 573 A.2d 536, 538 (1990). Bearing these standards in mind, we turn to examine, *seriatim,* the effect of the error in admitting each of the statements.

## 1. Third Statement

■ The third statement was made at 5:00 p.m. on May 28, 1985. Santiago had offered two previous statements that same day, at 1:40 p.m. and 2:40 p.m., respectively. The first of these statements, which was properly admitted at trial, was signed by Santiago and read into the record on direct examination by the detective who interviewed Santiago.[14] The second statement was not admitted at trial.[15]

**14.** The first statement Santiago gave was later signed by him, and in its entirety read as follows:

Q. [Graham] Can you read, write and understand English when it is spoken to you?
A. [Santiago] Yes sir.
Q. What is the highest grade of school that you have completed?
A. 10th Grade at Benjamin Franklin.
Q. Wilfredo, there are several bruises and scratches on your face and neck. Will you tell me how you received them?
A. Yesterday at approximately 7:30 p.m. on Wallace Street at 18th, I was just passing by on my bike and a guy named June ... called me out of my name [sic] after I yelled "how are you doing cowards[?]" I was just playing but I guess that he was in a bad mood. I got off my bike after he called me a coward back and I walked to

15. See note 15 in page 74.

him. We started pushing each other. I thought that he was for real and then we began to fight and then some friends broke up the fight. We started talking to each other and he told me that he was playing and I told him that I was just playing around too. I then went home and I stayed there for about a half an hour and I went outside and that's when I saw June on the corner of 17th and Wallace and we began talking. I have know June for quite a while. June was talking to Vic. I told Vic that he didn't have anything to do with it and for him to mind his business. Vic got mad and he took off his chains from around his neck and he gave them to somebody else and we began fighting. Then they stopped the fight because the cops were coming and I ran home and as I was going home, Officer Cruz was chasing me. I don't know for what reason. He was just chasing me. I stayed in the house for approximately ten to fifteen minutes and they told me that the police were looking for me and I want to know for what. So I went outside and that's when another cop locked me up and he took me to the 9th District and then they let me go after about twenty minutes. While I was in the cell, Officer Cruz walked in the cell and he started whipping me with a blackjack and about fifteen minutes after that they let me go. I went home and I stayed home until now.

Q. What time were you released from the 9th District?
A. Approximately 9:30 p.m.
Q. What time did you arrive at home?
A. About fifteen minutes later.
Q. Did you leave the house again after approximately 9:45 p.m.?
A. No, I was home with my mom and a few of her friends.
Q. The second time that you went back to 17th and Wallace, did you have any weapons on you?
A. I had a bat but the cops took that.
Q. At approximately 11:00 p.m. did you go the 9th Police District at 20th and Pennsylvania Avenue?
A. Yes. I went there to ask about my brother Manuel Rolon who was arrested by Officer Cruz.
Q. At what time did you get there?
A. Approximately 10:30 p.m.
Q. So when you told me that you didn't leave the house after you were arrested, you were incorrect, is that correct?
A. Yes, because my mom asked me to see about my brother.
Q. I am asking you again did you call the 9th Police District by telephone?
A. Yeah, my mom told me to call and I called just one time.
Q. Who went with you to the 9th District to see about Manuel?
A. I went by myself on my bike.
Q. What happened when you went into the District?
A. I asked the officer if he had Manuel Rolon my brother and he told me that he was on his way to 8th and Race.
Q. Tell me about the telephone call that you made to the District.
A. I called and I asked for him and they told me that he wasn't there so I went there personally.
Q. What time did you call the District?
A. Around noon [sic] [midnight] as soon as I got home, after I got out.

The typed memorialization of the third interview, which was conducted after Santiago had requested an attorney (and thus obtained illegally), was also signed by Santiago and read into evidence by the detective who conducted this interview.[16]

Q. Were you in the vicinity of 17th and Spring Garden sometime after midnight?
A. No, sir.
Q. Were you involved in the shooting death of Officer Trench who was shot at 17th and Spring Garden in the early hours this morning?
A. No, sir.
N.T. 7/25/86 at 24–27.

15. Although the record is somewhat unclear, it appears that the content of the second statement was not introduced at trial, at least in part because the trial court labored under the *false* apprehension that such a statement was inadmissible merely because it was made during a polygraph examination. *See* N.T. 7/25/86 at 31; *Commonwealth v. Schneider*, 386 Pa.Super. 202, 208, 562 A.2d 868, 871, *allocatur denied*, 525 Pa. 598, 575 A.2d 564 (1989) (recognizing the admissibility of the statement given during the polygraph examination where *results* of exam are not disclosed); *Commonwealth v. Smith*, 317 Pa.Super. 118, 122–124, 463 A.2d 1113, 1115–1116 (1983) (same); *see also generally* 89 A.L.R.3d 236 (collecting cases).

16. In its entirety, this statement reads as follows:
Q. Wilfredo are you known by any other names?
A. Cito and Ace.
Q. Were you involved in a fight yesterday 5–27–85?
A. Yes I was.
Q. Tell me about the fight that you were involved in yesterday.
A. I was involved in a fight with this guy they called June Bug around 18th and Wallace Street and the people that were out there broke the fight up. Me and June were talking and we had everything worked out. Victor came up and slipped me. He hit me on the left side of my face. Then we started hitting each other. The guys that were there broke up the fight. Then some cops came, one of them was Cruz. I was running towards home and Cruz hollered for me to stop. I got scared and ran around to the back yard of my house. I got a baseball bat and went back to where Victor was so that I could defend myself. This is when the cops came. I ran home straight up Wallace Street from 17th Street. When I got home I climbed the fence into my back yard and I went into the basement. The cops came and locked my brother up. I went outside and this is when they locked me up. They took me over to the hospital but didn't take me inside. I saw a lot of cops outside the hospital. Then they took me to the 9th District. Then I stayed there about 15 minutes to a half hour and they let me go. I went home. I walked straight up 20th Street to Green and over Green to the schoolyard and right to my house at 18th and Mt. Vernon. I

After careful review, we find that Santiago's third statement to the police is not materially different from his first. Significantly, Santiago does not argue to the contrary. Both statements were exculpatory and substantially supportive of one another. Moreover, meticulous review of the record reveals no specific reference to the third statement in either the prosecution's opening or closing arguments. Rather, as the Commonwealth argues, the introduction of the third statement more likely *aided* than *harmed* Santiago in his defense. Because Santiago chose not to take the stand, the introduction of these statements allowed him to claim the spoils of professed innocence without having to bear the expense of cross-examination.

Whatever the Commonwealth's original intent in seeking its introduction, or the defense's original intent in seeking its suppression, the defense's ability at trial to make productive use of the third statement was far more conspicuous than the Commonwealth's, as the following excerpt from defense's closing plainly illustrates:

> And you heard the words of the defendant read to you by those detectives. You will recall that in each one of these statements [Santiago] candidly admitted his involvement in the fights the day before, he admitted possessing a bat, but denied any involvement in this crime. And you'll recall that each of those detectives told him, you have the right to remain silent, you can have an attorney if you want one; and each time what did Mr. Santiago say? He said, no, I'll talk to you, I have nothing to hide. And he talked to them at length.

> stayed home and my mom told me to call up for my brother and see what happened to him. I called and they told me that they had Emanuel Rolon. I then walked over to the police station and they said that he was on his way to the Roundhouse. I then went back home. This was about 10:00 or 10:30 p.m. I watched the VCR, a tape of Motown. Around 11:30 or 12:00 midnight my brother called and I answered the phone and he said that he was going upstairs and that he would call me when he found out what bail the Judge gave him. Then I waited at home till this morning when my brother called. He called around 9:00 a.m. and my mom went and picked him up. I waited at home.
> *Id.* at 64.

N.T. 8/4/86 at 34–35. The prejudicial effect, if any, of this purely cumulative but erroneously admitted evidence was entirely inappreciable. Accordingly, we hold that its introduction was harmless beyond a reasonable doubt.

## 2. Fourth Statements

■ The introduction of the fourth statements, given on June 11, 1985, was similarly harmless. The record reveals that although police sought to challenge Santiago based on the accounts of several witnesses that he had been in possession of a gun at the street fight on the night before the murder, Santiago consistently denied any involvement in the crime and unfailingly denied having had a gun on the evening before the murder.[17] Indeed, the only inconsistency which may be found from comparing the fourth statement with any of Santiago's previous accounts is with regard to the time he was home and in bed (around 12:00 midnight v. 9:30 p.m.). *Compare* N.T. 7/25/88 at 27 *with* N.T. 7/28/86 at 20. This inconsistency, however, was not mentioned nor in any way specifically brought to the jury's attention by the Commonwealth. In all other respects, the material details Santiago offered were consistent with those he had previously given.[18] The remainder of the informa-

---

**17.** We note that by the time police sought to question Santiago for the fourth time, his resolve to subscribe to police interrogation had weakened, quite literally. Although Santiago agreed to waive his rights and answer questions posed to him by police as before, this time he would not affix his signature to the bottom of any memorialization of the interrogation, or even allow a contemporaneous commemoration to be made of his statements while he was being questioned. Consequently, the only evidence of Santiago's fourth and fifth statements adduced at trial was derived from what the police reduced to writing *after* the interrogations were complete. We note in passing that the defendant in *Minnick v. Mississippi, supra,* likewise refused to sign any statement he made to the police. *But see Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**18.** One of the officers who participated in the fourth set of interrogations read into evidence, among other things, the following pertinent portion of the *post hoc* commemoration of Santiago's statements: Oral Interview: Stated on Memorial Day about seven p.m. he had a misunderstanding with Virgilio. (Asked what he meant by a misunderstanding, he replied a fight). He left Virgilio, went to his house. Came back outside. Wilfredo was asked if he had anything in his

tion disclosed in this interview was otherwise properly intro-
duced at trial through other sources.[19] Viewing the testi-

hands, namely a bat. He stated no. *Detective Dougherty asked if he
had anything hidden under his shirt down in his pants, namely a
gun. Wilfredo stated no.*
&ast; &ast; &ast; &ast; &ast; &ast;

*"Wilfredo was asked* [when he was originally arrested the night of
the street fight] *if he told the officer* [who arrested him that night]
*he was a juvenile. Wilfredo replied yes, because he was scared
because he was on parole and didn't want to go back to jail.* Police
Officer Maldonado then released me. I went home. This was
about nine p.m. I went home. I told my mother what happened.
My mother told me to call and find out about my brother (Cousin–
Manuel Rolon). I called information, got the number to 8th &
Race. They told me he wasn't there. Then I called the 9th District.
I asked them about my brother. They told me he wasn't there.
Then I personally went to the 9th District. The policeman told me
that my brother wasn't there. He was at 8th & Race. I went home
and told my mother. Then I went to sleep. *This was about 9:30
p.m.*
&ast; &ast; &ast; &ast; &ast; &ast;

"Q. On the day (Memorial Day) when Police Officer Cruz chased
you to the house and you went into the basement, were you *carrying
a gun* when Police Officer Cruz was chasing you?"
"A. *No.*"
"Q. Did you *have a gun* on you Memorial Day, May 27th, 1985."
"A. *No.*"
"Q. *Do you own* or do you have in your house a *.38 caliber
handgun.*"
"A. *No, sir.*"
"Q. *Do you have or do you have access to any guns.*"
"A. *No, sir.*"
"Q. When you returned home from the 9th District at about 9:30
p.m., Memorial Day, May 27th, 1985, did you go outside of the
house after 9:30 p.m. until the time you were arrested at about one
p.m. on Tuesday, May 28th, 1985."
"A. No, I stayed in the house and went to sleep."
&ast; &ast; &ast; &ast; &ast; &ast;

"Q. (By P/O Torres) Were you riding a bike on Memorial Day [the
night before the murder]."
"A. Yeah. It's a gray Fuji. *I had it for about two weeks. I bought
it off some black guy for $75.*"
N.T. 7/28/86 at 17, 19–21 (emphasis added).

19. We note that to the extent Santiago's admission as to having lied
about his age was harmful, it is clear that such evidence was properly
admitted against Santiago by the Commonwealth through direct ex-
amination of Officer Maldonado at a different point in the trial. *See*
N.T. 7/17/86 at 166 (testifying that Santiago had lied to him about his
age and his name). Admission of such testimony in the context of the
fourth statements Santiago gave to the police again merely allowed

mony as a whole, and especially together with that of the previous and equally exculpatory statements which were already introduced in evidence, we are persuaded by the Commonwealth that this evidence could not have contributed to a guilty verdict.

### 3. Fifth Statements

Unlike the third and fourth sets of questioning, on June 27, 1985, when police went to Santiago's cell to bring him to the station for questioning on the last occasion, they were prepared to confront Santiago with signed statements given by witnesses in the investigation. After Santiago had been read and had waived his *Miranda* rights, he agreed to questioning. On this occasion, although his account remained generally exculpatory, several inconsistencies were established.[20]

Santiago to explain why he had lied, without taking the stand and having to face the threat of cross-examination.

**20.** As Santiago had during the fourth set of questions, before he answered any questions on the last occasion, he stipulated that police could not contemporaneously memorialize his comments. On direct examination, Officer Raymond Dougherty, one of the interviewing detectives, testified that the following transpired:

A. Since the defendant had maintained that he was never in possession of a weapon or never had a handgun and in particular a .38 caliber handgun, the defendant was shown several statements which refuted the fact that he stated that he didn't have a gun. In other words, the statement indicated that he did in fact have a handgun and did in fact on Memorial Day, May 27th, he was in possession of a handgun and on May 28th, he was in possession of a handgun and in particular a .38 caliber handgun, a Smith & Wesson handgun, and he was confronted with this information.
Q. And by what means or manner was the defendant confronted with that information?
A. He was shown the statement, a portion of the statement given to us by various other people, allowed to read it, he was shown it and he read it.
Q. Subsequent to confronting the defendant with that information, did you receive from the defendant any change in information to that which you had received from him on the 11th of June, 1985?
A. *Yes.* At *11:05 a.m.,* five minutes after Police Officer Deyne, who had joined us at 11:00 o'clock, five minutes after he had entered the room, the *defendant admitted getting a bike or getting the bike from*

*Edward Gonzalez.* He was allowed to read Gonzalez's statement in its entirety.

\* \* \* \* \* \*

Wilfredo Santiago, Cito, was confronted with the statement of Edwardo Gonzalez. And then the defendant was asked, *"Cito, Wilfredo, do you or do you still say that you bought the bike off the black guy,"* and Cito responded, *"No. I bought it from that guy."* Lt. Shelton then asked, "What guy," and Cito then said, *"That guy, Eduardo Gonzalez."*

Lt. Shelton asked, "How did you pay for it." Cito then replied, *"I was to give him $75 cash and only paid him $50 and I still owe him $25."*

Police Officer Deyne then asked Cito, "When did this transaction take place from the date that you had the fight at the playground." He said, "two weeks before."

\* \* \* \* \* \*

Myself and Lt. Shelton left [the room] at 11:15.

Q. With whom, if anyone, was the defendant left in the room?
A. Police Officer Deyne was still in the room at that time.

N.T. 7/28/86 at 32, 35, 36 (emphasis added). Also testifying on direct examination, Officer Deyne stated:

"I, Police Officer Deyne, stayed in the room with Cito and I then asked him what was the real deal that he had made with Eduardo between the gun and the bicycle. *Cito then replied to me that he told Eduardo that he will give him the gun for Eduardo's bicycle.* I then asked Cito where did this transaction take place. Cito then said that it was inside his room. I, Deyne, then asked Cito where was he keeping the gun, whether it was inside a bag or wrapped around a rag or inside a box. Cito did not tell me. He just said he had it in the room."

Q. Before receiving that information from the defendant, who, if anyone, in the Homicide Unit did you contact that you had received that information from the defendant?
A. Lt. Shelton and Detective Dougherty.
Q. Referring to the chronology, C–61 as necessary, during what period of time did the defendant tell you that information you had just related to the jury from your notes of it?
A. That was from 11:20 to 11:35, a short period of time.

*Id.* at 75 (emphasis added). The Commonwealth concluded that day's chronology of statements in Officer Dougherty's direct exam:

Q. At some point in time, did Police Officer Deyne recall your attention to the room?
A. Yes, he did.
Q. At what point in time?
A. At 11:20 a.m., Police Officer Deyne came out of the room for ten or fifteen seconds, I guess, and supplied us with some information concerning what Santiago had just told him.
Q. Based upon receiving that information, did you re-enter the interview room?
A. Yes. At 11:35 a.m., myself and Lt. Shelton entered the room. Police Officer Deyne was still in the room.

80

The first of these inconsistencies is apparent through Santiago's own admission during questioning. In the fourth set of questioning, Santiago claimed to have purchased the bicycle he had been riding on the night of the murder from "some black guy." *See* N.T. 7/28/86 at 21. When confronted with statements made by other witnesses on the last occasion, however, Santiago quickly changed his story to reflect the fact that he had bought the bicycle for $75 from Eduardo Gonzalez, who was not a black man. N.T. 7/28/86 at 35. Even this story was subject to revision, however, as Santiago changed his version of how he acquired the bicycle only moments later on the same day when questioned by a different officer, resting finally with a claim that he had *traded* a .38 calibre *gun* for it. N.T. 7/28/86 at 75, 78.

Moreover, after the Commonwealth called Eduardo Gonzalez himself to testify, additional inconsistencies in Santiago's account appeared. With regard to Santiago's acquisition of the bicycle, Gonzalez contradicted Santiago's claim

Q. Referring to Page 2 of C–61 as necessary, that entry noted 11:35 a.m., what if any information did you receive from the defendant at or about 11:35 a.m.?
A. It indicates the interview took place 11:35 a.m. Lt. Shelton, Detective Dougherty and Police Officer Deyne· inside Room "D". Detective Dougherty, "Cito, when did you get the gun." Cito then said, *"he found the gun on the lot at 20th & Wallace Streets."* Detective Dougherty, "Cito, describe the gun." Cito replied, *"It was a .38 caliber, silver with a black handle."* And then he answered he had the gun for about 10 days to 12 days. Detective Dougherty then asked, *"Was there any bullets in the gun,"* and Cito said, *"Yes."* Detective Dougherty asked, "What kind of bullets, describe them." Cito then said, "I don't know."
Lt. Shelton then asked Cito if he, Cito, had a gun on his person on Memorial Day, May 27th, 1985. Cito then answered "No."
Detective Dougherty then asked, "On Memorial Day, May 27th, when you left the police station at about one p.m. and went home, and told your mother that your cousin, Rico, was down at 8th & Race and you said you never left the house from that time, why did your mother lie and tell the police that you stayed home from eleven p.m. and you never left the house and then stayed there until the police came."
Cito said, "My mother did not lie, I never left the house from the time I came back from the police station until the police came the next day."
*Id.* at 36–37, 38 (emphasis added).

that he had purchased or traded the gun (depending on the version accepted) for it. Instead, Gonzalez testified that he had *loaned* the bicycle to Santiago sometime before the murder. N.T. 7/17/86 at 139. More significantly, in sharp contrast to Santiago's statement that he had disposed of a gun two weeks before the murder by bartering it away to Gonzalez, Gonzalez testified that Santiago had *shown* him the gun a mere *six days* before the murder, that no exchange took place, and that to his knowledge, the gun remained in Santiago's possession. *Id.* at 99–109.

The mere fact that inconsistencies in Santiago's statements were exposed to the jury alone could have altered the verdict. In closing, the Commonwealth urged the jury to consider that the inconsistencies in Santiago's statements could be viewed as evidence of Santiago's consciousness of guilt. N.T. 8/4/86 at 78. Moreover, the Commonwealth requested and received a jury instruction in which the Court charged that it was appropriate to do so. *See id.* at 8, 136.

Far more significant than the mere fact that inconsistencies were established, however, is the information conveyed in the last set of statements. Of the first four statements, three were admitted at trial. Not once in these statements did Santiago mention owning a gun. When confronted during the last set of questioning with evidence that he had possessed a gun, Santiago, for the first time, admitted possessing a gun of the same calibre as that used to kill Officer Trench. The very timing of such an admission itself impugns Santiago's previous statements. Even more incriminating is the fact that the Commonwealth not only introduced evidence that Santiago did not rid himself of the gun as he had claimed, *i.e.* Gonzalez's testimony that he did not barter for the gun, but also argued in closing that the failure of Santiago to come forth earlier with the fact that he owned a gun established his consciousness of guilt. *See, id.* at 96.

The issue of whether the accused possessed a specific weapon in a murder trial is always an ultimate and crucial issue of fact. Evidence that an accused admitted to having

owned such a weapon only shortly before the crime, and evidence that refutes the accused's explanation for dispossessing the weapon, bears *directly* on this ultimate issue.

We cannot say, under these circumstances, that the Commonwealth has proven beyond a reasonable doubt that there is no reasonable likelihood the testimony of the officers' regarding Santiago's fifth statements could not have contributed to the verdict. Regardless of how *generally* exculpatory the final account may have been, the combined effect of the negative inferences that may have been drawn from both the exploited inconsistencies and the critical admission contained in the fifth statements could very well have been harmful to the defense.

Accordingly, we find that the error in introducing the fifth statements cannot be deemed harmless. We are, therefore, compelled to award a new trial to Santiago based on the introduction of these statements at trial.

## III. DUE PROCESS

 Santiago asserts as a second, independently sufficient basis for reversal, an issue of first impression: whether due process guarantees of the United States Constitution require the trial court to disclose to the defense materially exculpatory evidence not possessed by the prosecution. This novel question originates from the trial court's decision to conduct pre-trial closure interviews with potential trial witnesses *in camera*, outside the presence of both defense counsel and the prosecution.[21] Essentially, Santiago argues that because neither he nor the prosecution was aware of

---

**21.** We note that while it is clear the court was authorized to conduct the closure hearing *in camera, see Waller v. Georgia,* 467 U.S. 39, 49, 104 S.Ct. 2210, 2217, 81 L.Ed.2d 31, 40 (1984) (requiring the trial court to consider detail about the need for closure, *in camera,* if necessary); *Commonwealth v. Penn,* 386 Pa.Super. 133, 144–145, 562 A.2d 833, 838–39 (1989) (requiring the trial court itself to examine the nature, extent, and impact of any attempts to intimidate witnesses, *in camera,* if necessary), the question of whether it was appropriate to do so *outside the presence of counsel* is undecided. As the authority to so conduct the hearings is not herein oppugned, we express no opinion as to the propriety of the court's decision in this regard.

the contents of such testimony, the trial court owed him a duty of disclosing testimony offered during these interviews which he now asserts tended to exonerate him of the murder charge.

The Commonwealth offers several arguments in rebuttal. First, the Commonwealth contends that as a neutral party in the proceedings, the trial court owed no duty to disclose any evidence to either party. Rather, relying on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Commonwealth maintains that due process guarantees only that the *prosecution* disclose materially exculpatory evidence. Second, the Commonwealth contends that Santiago has waived any non-disclosure challenge by failing to request the evidence from the trial court before trial. Finally, the Commonwealth urges that the undisclosed evidence complained of instantly was not materially exculpatory. We address each of the Commonwealth's arguments *seriatim*.

## A. COURT'S OBLIGATION TO DISCLOSE MATERIALLY EXCULPATORY EVIDENCE

The fourteenth amendment to the United States Constitution provides that, "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law...." Like its fifth amendment counterpart which applies such safeguards to actions of the federal government, it is a spacious guarantee which is derived in part from equally broad and ambiguous English Common Law proclamations.[22] Because of the imprecision of the guarantee,[23]

---

**22.** *See e.g.* 28 Ed.2. 3, ch. 3 (1354) ("No man ... shall be put out of his lands or tenements nor taken, nor disinherited, nor put to death, without he be brought to answer by *due process of law.*") (emphasis added).

**23.** *See Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 276, 15 L.Ed. 372 (1856) ("The constitution contains no description of those processes which it was intended to allow or forbid."); *see also Burns v. Wilson,* 346 U.S. 137, 149, 73 S.Ct. 1045, 1052, 97 L.Ed. 1508, 1518 (1953) ("There is no table of weights and measures for ascertaining what constitutes due process.") (per Frank-

the United States Supreme Court has often looked to the Bill of Rights for guidance in determining how to resolve conflicting claims concerning its meaning, applying to the states only those rights seen as "fundamental" to the American scheme of justice. *See Duncan v. Louisiana,* 391 U.S. 145, 148–49, 88 S.Ct. 1444, 1446, 20 L.Ed.2d 491, 495 (1968) (collecting case).

Instantly, Santiago does not argue to this Court that we should incorporate a "fundamental" clause of the Bill of Rights.[24] Rather, Santiago asserts simply that due process, in its most rudimentary sense, mandates that a trial court disclose to the defense materially exculpatory evidence in its possession. For the following reasons, we agree.

Born of a repugnance toward ancient modes of proof such as compurgation, trial by ordeal, battle and wager of law, our system of justice demands that accusations be proved through the powers of reason, rather than

furter, J.); *Moyer v. Peabody,* 212 U.S. 78, 84, 29 S.Ct. 235, 236, 53 L.Ed. 410 (1909) ("What is due process of law depends on circumstances. It varies with the subject matter and the necessities of the situations.") (per Holmes, J.).

**24.** It is important to note that Santiago does not argue that the trial court's failure to disclose such evidence violated the Pennsylvania Constitution. *See e.g.* Pa. Const. Art. I § 9. Moreover, although Santiago refers briefly to the Confrontation Clause of the sixth amendment in his statement of questions presented, *see* Appellant's Brief at 2, he does not advance this argument in the argument section of his brief. As such, we find any challenge based specifically on the Confrontation Clause waived. *See Commonwealth v. Drew,* 353 Pa.Super. 632, 510 A.2d 1244 (1986). We note only that in this regard a plurality of the United States Supreme Court recently rejected a similar claim holding that neither the sixth amendment Confrontation Clause nor the Compulsory Process Clause protects the right to have evidence disclosed. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 61, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40, 60 (1987). This holding has been recognized several times by this Court in the past. *See Commonwealth v. Carillion,* 380 Pa.Super. 458, 465, 552 A.2d 279, 282 (1988) (*en banc*); *Commonwealth v. Kyle,* 367 Pa.Super. 484, 492, 533 A.2d 120, 124, *allocatur denied,* 541 A.2d 744 (1987).

by vestiges of magic or religion.[25] In our system, truth is determined through an essentially adversarial process in which, " '[t]ruth is best discovered by powerful statements on both sides of the question.' " *United States v. Cronic,* 466 U.S. 648, 655, 104 S.Ct. 2039, 2044–2045, 80 L.Ed.2d 657, 665 (1984) *(quoting* Lord Eldon from Kaufman, *Does the Judge Have a Right to Qualified Counsel?,* 61 A.B.A.J. 569, 569 (1975). Thus, we have placed reliance in a system in which parties take an active, highly partisan role in unearthing and arguing the significance of relevant evidence from which the decision-maker may relatively passively determine truth. *See* U.S. Const. Art. III; *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962).[26]

The success of our adversarial touchstone, however, is entirely contingent upon the availability of evidence from which the parties may base their arguments.[27] For fear

**25.** *See Hirschkop v. Snead,* 594 F.2d 356, 377 (4th Cir.1979); Sward, *Values, Ideology, and the Evolution of the Adversary System,* 64 Ind. L.J. 301 (1989).

**26.** In the criminal context, the defendant's right to highly partisan and zealous advocacy is specifically recognized as fundamental to our notion of due process. *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (holding sixth amendment rights applicable to the states through the fourteenth amendment's due process guarantee); *see also Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2533 45 L.Ed.2d 562, 572 (1975) (The sixth amendment "constitutionalizes the right in an adversary criminal trial to make a defense as we know it."); *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970) ("[T]he mission of the [sixth amendment] is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the [testimony].' ").

**27.** It is worth noting that "inquisitorial" jurisdictions, in which the decision-maker "actively" participates in the discovery of evidence, are not subject to a claim that the trial court should have disclosed certain evidence. In those jurisdictions, the decision-making body has before it the entire dossier from which it may credit or discredit any testimony offered at trial. *See* Damaska, *Evidentiary Barriers to Conviction and Two Models of Criminal Procedure: A Comparative Study,* 121 U.Pa.L.Rev. 506, 533–34 (1973). In addition, the defendant and his counsel acquire an absolute right, almost invariably, to inspect the entire dossier to prevent surprise. *Id.* Moreover, it appears that even other "adversarial" jurisdictions preclude the possibility that the defendant will not obtain exculpatory evidence by allowing the

that life and liberty may be deprived unjustly, the concern that the accused in a criminal case is able to discover relevant evidence has been especially grave in our system. As the Supreme Court observed more than thirty years ago,

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy.

*Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377, 1390–91 (1959). In 1974, the Supreme Court echoed these thoughts:

> "[T]he twofold aim [of criminal justice] is that guilty shall not escape or innocence suffer." *Berger v. United States,* 295 U.S. [78], at 88, 55 S.Ct. [629], at 633, 79 L.Ed., at 1314 [ (1935) ]. We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal

defense access to the prosecution's files through a combination of procedural devices and informal arrangements. *See* Schlesinger, Baade, Damaska and Herzog, *Comparative Law,* 483 (5th ed. 1988). By contrast, our decision-making body (here the jury) must rely solely on the evidence adduced at trial before it, which may or may not include existing relevant evidence, depending on the success of counsel in discovering it. Thus, a claim based on the due process right to disclosure of materially exculpatory evidence is relatively unique to our system. We note, however, that had the trial court, not the jury, been sitting as finder of fact, its obligations would have been indisputable. *See* Pennsylvania Code of Judicial Conduct, Canon 3(C)(1)(a) (judge is obligated to recuse himself if his impartiality might be reasonably questioned due to his "personal knowledge of disputed evidentiary facts concerning the proceeding.").

justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039, 1064 (1974).[28]

The recognition that non-disclosure of exculpatory evidence undermines the sanctity of our system led the Supreme Court to its now familiar holding in *Brady v. Maryland, supra.* There, for the first time, prosecutors were required in a limited sense, to aid in the defense of the accused, by "disclos[ing] evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 489–90 (1985). This limited departure from the adversarial process was intended "not to displace the adversarial system, but to ensure that a miscarriage of justice does not occur." *Id.,* 473 U.S. at 675 & n. 6, 105 S.Ct. at 3379–80 & n. 6, 87 L.Ed.2d at 489 & n. 6. The disclosure of exculpatory evidence by the prosecution is thus thought necessary to avoid "a corruption of the truth seeking function of the trial process." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 350 (1976).

**28.** The debilitating effect of non-disclosure of exculpatory evidence is perhaps best characterized by the Supreme Court in ruling that convictions based on (undisclosed) perjured testimony violate due process:

It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.

*Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791, 794 (1935); *see also Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (holding that due process guarantees are violated, the perjured testimony was unsolicited but allowed to go uncorrected).

■ The Commonwealth argues that Santiago's due process right to disclosure ends with the right to have the prosecution turn over materially exculpatory evidence in its possession. Such an argument founders, however, in view of the fact that, as the United States Supreme Court has made clear, "[t]he aim of due process 'is not punishment of society for the misdeeds of the prosecutor, but avoidance of an unfair trial to the accused.' " *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 88 (1982) (quoting *Brady v. Maryland, supra*, 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218). The sole significant factor in determining whether due process requires the disclosure of materially exculpatory evidence to the defense is not the character of the party in possession of the evidence, but rather the character of the evidence. *See Smith v. Phillips, supra*, 455 U.S. at 219–220, 102 S.Ct. at 947, 71 L.Ed.2d at 88. That the prosecutor is in possession of the relevant evidence, is in and of itself, inconsequential.

■ Similarly flawed is the Commonwealth's argument that because of the unique mandate of impartiality imposed on judges, *Brady* requirements cannot be extended to the court. Where circumstances dictate, judges are regularly required to intervene in the proceedings as this Court has previously recognized:

"[A] courtroom is a court of justice and not just a battleground for the tilting of attorneys or a testing of their wits and oratory,—to so limit it would often jeopardize or defeat justice." *Keating v. Belcher, supra*, [384 Pa. 129] 119 A.2d [535] at 537. [ (1956) ] It is the purpose of a criminal trial to ascertain the truth, and it is the business of the trial judge to see that that end is obtained. *Commonwealth v. Seabrook*, 475 Pa. 38, 47, 379 A.2d 564, 568 (1977). Thus, it is properly for the trial court to ask questions about facts which did not appear from either counsel's examination of the witness. *See Commonwealth v. Hammer, supra*, [508 Pa. 88] 494 A.2d [1054] at 1060 (1985); *Commonwealth v. Seabrook, supra*, 379 A.2d at 568. Indeed, the trial court may go so

far as to recall a witness to supply an omission of proof as to a material issue. *See Commonwealth v. Britton, supra*, [334 Pa.Super. 203] 482 A.2d [1294] at 1297–98; [(1984)] *Commonwealth v. Miller*, 234 Pa.Super. 146, 154, 339 A.2d 573, 577–78 (1975), *affirmed* 469 Pa. 24, 364 A.2d 886 (1976).

*Commonwealth v. King*, 378 Pa.Super. 553, 557–58, 549 A.2d 195, 197 (1988). Identical expressions occur in *Commonwealth v. Roldan*, 524 Pa. 366, 572 A.2d 1214 (1990), wherein our Supreme Court explained:

> Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses' credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them.

> That does not mean that a trial judge must sit idly by, a mere evidential technician, silenced in the face of the impossible, absurd, ambiguous or the frivolous. Nor should he leave unasked or unanswered questions that center the matter or amplify relevant testimony on the question or issue. It is a false and dangerous neutrality that would allow loss of liberty or property when another question at further inquiry would gain the fact, expose a false or improper premise, interest or bias of a witness, or correct insinuation unfounded in the record. It is not partisan to maintain the wheel, steering evenly, between competing and often aggressive counsel, anxious to set the course.

*Id.* 572 A.2d at 1215 (*quoting Commonwealth v. Myma*, 278 Pa. 505, 508, 123 A. 486, 487 (1924)).

Indeed, the duty to intervene to prevent a miscarriage of justice has even been extended, in an analogous situation, to the disclosure of materially exculpatory evidence. In *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), the United States Supreme Court was faced with the question of whether due process required a third party to turn over confidential child abuse records to the trial

court based on the defense's need to obtain materially exculpatory evidence. There, the Court held:

> We find that Ritchie's [the defendant's] interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS files be submitted only to the trial court for *in camera* review. Although this rule denies Ritchie the benefits of an "advocate's eye," we note that the trial court's discretion is not unbounded. If a defendant is aware of specific information contained in the file (*e.g.*, the medical report), he is free to request it directly from the court, and argue in favor of its materiality. Moreover, the duty to disclose is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial.

*Id.* 480 U.S. at 60, 107 S.Ct. at 1003, 94 L.Ed.2d at 59.

Our research has not disclosed, nor does logic dictate, any reason why evidence in the sole possession of the trial court should be any less subject to due process disclosure requirements. The fact that the trial court, as a neutral party in the proceedings, may not view the evidence with an "advocate's eye," [29] is not dispositive; however so handicapped courts may be, it is well settled that their duties may properly include the responsibility of reviewing and disclosing evidence which they determine materially exculpatory. *See e.g. Pennsylvania v. Ritchie, supra; cf. United States v. Figurski,* 545 F.2d 389, 391 (4th Cir.1976) (holding that the trial court is required to review and disclose evidence to the defense contained in presentence reports which it determines materially exculpatory because the "ends of justice" demand "that a defendant be convicted on nothing less than the full truth."); *Commonwealth v. Rush,* 493 Pa. 358, 360, 426 A.2d 588, 589 (1981).

Rather than denigrating or jeopardizing the judge's role as an impartial arbitrator, the limited duty to disclose

**29.** *See Dennis v. United States,* 384 U.S. 855, 875, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973, 986 (1966).

envisioned here is fully consistent with and in fact is a necessary component of the search for truth and justice that judges, like prosecutors, must undertake. *See Giles v. Maryland*, 386 U.S. 66, 98, 87 S.Ct. 793, 809, 17 L.Ed.2d 737, 758 (1967) (The state's obligation under the Due Process Clause "is not to convict, but to see that so far as possible, truth emerges.") (Fortas, J., concurring); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), *overruled on other grounds, Katz v. United States*, 389 U.S. 347, 352–53, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 582–83 (1967). Indeed, because of the unique role judges fulfill as ramparts to the legitimacy of our system, judges are obligated to:

> ... set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice. * * * *Public confidence in the fair and honorable administration of justice*, upon which ultimately depends the rule of law, *is the transcending value at stake.*

*Sherman v. United States*, 356 U.S. 369, 380, 78 S.Ct. 819, 825, 2 L.Ed.2d 848, 855–56 (1958) (Frankfurter, J., concurring) (emphasis deleted and added).[30]

Nothing would so quickly or inevitably undermine the public's confidence in our judiciary than for a judge to withhold evidence which would exonerate an accused because of an avowed adherence to "strict impartiality." As the late Justice Musmanno cogently observed:

> The most elementary principles of what "is deemed reasonable and right" dictate that [the defendant] be allowed

---

**30.** *See also Glasser v. United States*, 315 U.S. 60, 71, 62 S.Ct. 457, 465, 86 L.Ed. 680, 699 (1942) ("Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused."); *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321, 1324 (1933) ("In a trial by jury ... the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct...."); *cf. Sacher v. United States*, 343 U.S. 1, 8, 72 S.Ct. 451, 455, 96 L.Ed. 717, 723 (1951) (Courts role is to prevent adversarial strife from perverting the judicial process by supervising and controlling parties and representing overriding social interests in impartial justice).

to see what witnesses have previously said to the government about him when they testify against him in court. *It is simply unthinkable that in a government of the people, the government should withhold from one of the people evidence which could prove him innocent of a crime against all the people.*

*Commonwealth v. Smith*, 417 Pa. 321, 332, 208 A.2d 219, 225 (1965) (emphasis added).

We find in view of the foregoing, that the due .process interests of safeguarding the integrity of our adversarial search for the truth of accusations, as well as preserving public confidence in the sanctity of our system, mandate that a trial court, no less than a prosecutor, disclose to the defense any materially exculpatory information in its possession. This conclusion, though unique to Pennsylvania jurisprudence, has been reached by at least one court before. Faced with an almost identical question of whether to disclose to the defense at trial materially exculpatory evidence in the court's possession, a federal district court in New Jersey recognized:

> The prosecution has the burden to disclose to the defense all evidence which might create a reasonable doubt that would not otherwise exist, *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976); *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*"Brady"*). The Court, unlike the prosecution, is not an adversarial party in the proceedings. It sits neither to prove guilt nor establish innocence; but merely to maintain a fair trial. It is almost inconceivable that a court, possessing exculpatory information, must remain silent when the prosecution possessing identical information would be compelled to speak.

*United States v. Cuthbertson*, 511 F.Supp. 375, 382 (D.N.J.), *reversed on other grounds*, 651 F.2d 189 (3d. Cir.), *cert. denied sub nom, Cuthbertson v. C.B.S., Inc.*, 454 U.S.

1056, 102 S.Ct. 604, 70 L.Ed.2d 594 (1981).[31] We entirely agree.

In sum, therefore, we conclude that where a trial court is in the sole possession of materially exculpatory evidence, it must disclose that evidence to the defense. We note that the duty here is quite limited in practical effect. Ordinarily, prosecution or defense counsel will be privy to any information available to the judge; hence, the need for judicial disclosure will be obviated. When a judge has exclusive knowledge of such evidence, as here or as in *Pennsylvania v. Ritchie, supra,* then the duty will arise. Moreover, materiality is another significant limitation. It is only when a miscarriage of justice is threatened that due process requires judicial intervention through *sua sponte* disclosure.

## B. WAIVER

The Commonwealth's next argument opposing relief is that Santiago's disclosure argument has been waived. The Commonwealth argues that because Santiago was aware that the *in camera* interviews had taken place, it was incumbent upon the defense to make a *specific* request to the judge for transcripts of the interviews. In the absence of such a specific request, the Commonwealth urges, the trial court had no duty to disclose any evidence to the defense. We disagree.

In clarifying the appropriate standard by which to measure nondisclosure of evidence by the prosecutor, the United States Supreme Court in *United States v. Bagley, supra,* addressed the question of whether a specific request for material need be made to invoke the due process duty to disclose exculpatory information. There, the United States Supreme Court explained:

**31.** We note that on appeal, the Third Circuit Court of Appeals expressly declined to address "the contention that the teachings of *Brady v. Maryland,* [*supra* ], apply only to materials in possession of the prosecution and not to materials in possession of a court." *United States v. Cuthbertson,* 651 F.2d at 196 n. 3.

It remains to determine the standard of materiality applicable to the nondisclosed evidence at issue in this case. Our starting point is the framework for evaluating the materiality of Brady evidence established in *United States v. Agurs* [427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)]. The Court in *Agurs* distinguished three situations involving the discovery, after trial, of information favorable to the accused that had been known to the prosecution but unknown to the defense. The first situation was the prosecutor's knowing use of perjured testimony or, equivalently, the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false. The Court noted the well-established rule that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103 (footnote omitted). Although this rule is stated in terms that treat the knowing use of perjured testimony as error subject to harmless-error review, it may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt. The Court in *Agurs* justified this standard of materiality on the ground that the knowing use of perjured testimony involves prosecutorial misconduct and, more importantly, involves "a corruption of the truth-seeking function of the trial process." *Id.*, at 104, 96 S.Ct., at 2397.

At the other extreme is the situation in *Agurs* itself, where the defendant does not make a Brady request and the prosecutor fails to disclose certain evidence favorable to the accused. The Court rejected a harmless-error rule in that situation, because under that rule every nondisclosure is treated as error, thus imposing on the prosecutor a constitutional duty to deliver his entire file to defense counsel. 427 U.S. at 111–112. At the same time, the Court rejected a standard that would require the defen-

dant to demonstrate that the evidence if disclosed probably would have resulted in acquittal. *Id.*, at 111, 96 S.Ct. at 2401. The Court reasoned: "If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice." Ibid. The standard of materiality applicable in the absence of a specific Brady request is therefore stricter than the harmless-error standard but more lenient to the defense than the newly-discovered-evidence standard.

The third situation identified by the Court in *Agurs* is where the defense makes a specific request and the prosecutor fails to disclose responsive evidence. The Court did not define the standard of materiality applicable in this situation, but suggested that the standard might be more lenient to the defense than in the situation in which the defense makes no request or only a general request. 427 U.S. at 106, 96 S.Ct. at 2399. The Court also noted: "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *Ibid.*

The Court has relied on and reformulated the *Agurs* standard for the materiality of undisclosed evidence in two subsequent cases arising outside the Brady context. In neither case did the Court's discussion of the *Agurs* standard distinguish among the three situations described in *Agurs*. In *United States v. Valenzuela–Bernal*, 458 U.S. 858, 874, 102 S.Ct. 3440, 3450, 73 L.Ed.2d 1193 (1982), the Court held that due process is violated when testimony is made unavailable to the defense by Government deportation of witnesses "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." And in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that a new trial must be granted *when evidence is not introduced because of the incom-*

*petence of counsel only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."* Id., at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674. The *Strickland* Court defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Ibid.

*We find the Strickland formulation of the Agurs test for materiality sufficiently flexible to cover the "no request," "general request," and "specific request" cases of prosecutorial failure to disclose evidence favorable to the accused:* The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

The Government suggests that a materiality standard more favorable to the defendant reasonably might be adopted in specific request cases. *See* Brief for United States 31. The Government notes than an incomplete response to a specific request not only deprives the defense of certain evidence, but also had the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued. Ibid.

We agree that the prosecutor's failure to respond fully to a Brady request may impair the adversary process in this manner. And the more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. *The possibility of impairment does not necessitate a different standard of materiality, however, for under the Strickland*

*formulation the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.* The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response.

*United States v. Bagley, supra,* 473 U.S. at 678–683, 105 S.Ct. at 3381–3384, 87 L.Ed.2d at 491–494 (1985) (footnotes omitted) (emphasis added).

 Thus, the obligation imposed on a prosecutor to disclose exculpatory information does not depend on the presence of a specific request. Rather, the due process duty to disclose evidence is contingent upon only the degree to which the evidence possessed is materially exculpatory. *See Boyde v. California,* 494 U.S. 370, —— n. 4, 110 S.Ct. 1190, 1198 n. 4, 108 L.Ed.2d 316, 329 n. 4 (1990).

We have found, for the reasons set forth in the previous subsection, that the duty imposed on the trial court to disclose information is at least equal to the duty imposed on the prosecution. *A fortiori,* the trial court's obligation to disclose to the defense materially exculpatory information in its possession, like that of the prosecution, exists absent any request.[32] Accordingly, we find no merit in the Com-

32. This conclusion is consistent with the decision in *Pennsylvania v. Ritchie, supra.* There, the Supreme Court held that although the defense did not need to make a "specific" request for evidence, the degree of the specificity of the request may have had a bearing on the assessment of materiality since courts are not required to allow the defense to embark on fishing expeditions. *See Pennsylvania v. Ritchie, supra,* 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15, 94 L.Ed.2d at 58 n. 15. Here, because the trial court had *sole* possession of evidence, there is no duty to make even a general request since the trial court can determine the materiality of evidence with or without the eye of an advocate. This is not to say, however, that the trial court should not consider the merit of adversarial arguments raised in any specific requests for information it may alone possess. Our holding is

monwealth's argument that Santiago's disclosure argument has been waived.[33]

## C. MATERIALITY

The prosecution argues that the undisclosed impeachment evidence heard *in camera* was merely cumulative of other equally damaging impeachment evidence otherwise available to the defense. In two respects we agree; in one critical respect we do not.

 Briefly reiterated, "materially exculpatory" is defined by our Supreme Court as follows: "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley, supra,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494. Evidence which serves only to impeach other evidence may itself be considered materially exculpatory, as the Supreme Court explained:

> Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Such evidence is "evidence favorable to an accused," *Brady,* 373 U.S. at 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 so that, if disclosed and used effectively, *it may make the difference between conviction and acquittal. Cf. Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the

simply that the duty to disclose materially exculpatory evidence is not obviated by the absence of a specific request.

**33.** We note that our decision requiring the trial court to disclose to the defense materially exculpatory information even absent a request to do so renders moot the Commonwealth's argument that Santiago's claim fails the "after discovered evidence" test. *See Commonwealth v. Scott,* 503 Pa. 624, 628, 470 A.2d 91, 93 (1983).

witness in testifying falsely that a defendant's life or liberty may depend").

*United States v. Bagley, supra,* 473 U.S. at 676, 105 S.Ct. at 3380, 87 L.Ed.2d at 490 (emphasis added). Strictly cumulative evidence cannot, under this standard, serve as grounds for a new trial as it would lack sufficient effect on the proceedings. *See United States v. Agurs, supra,* 427 U.S. at 113–114, 96 S.Ct. at 2402, 49 L.Ed.2d at 355 (1976); *Giles v. Maryland, supra,* 386 U.S. at 98, 87 S.Ct. at 809, 17 L.Ed.2d at 758 (Fortas, J., concurring).

At each of the *in camera* interviews the trial court conducted with potential trial witnesses, the trial judge permitted the presence of no one except himself, the court reporter, and the potential witness. Each witness was placed under oath and, in an effort to encourage candor, each was solemnly offered assurances of strict confidentiality as to any statements they might make to the court.

■■■ The testimony given during the *in camera* interview of Jose Rosario, preceded by an oath and assurances of confidentiality as well, was in relevant part as follows:

THE COURT: You understand I'm the judge, I'm not— I'm not the prosecutor.

THE WITNESS: Okay.

THE COURT: Do you understand that?

THE WITNESS: Yes.

THE COURT: My purpose here today is to interview you to find out whether or not you are afraid of anybody or whether or not someone has been harassing you.

THE WITNESS: *No, nobody has been harassing me.* It's like, you know, *I feel as though the detectives have,* you know, *involved me in this.* They're the ones that involved me. They picked me up off the street for no reason at all, you know, and *I got to admit they gave me pretty rough treatment.*

THE COURT: *The police gave you pretty rough treatment?*

THE WITNESS: Uh-huh. *They even made me take a lie detector test, which I took and I passed and, you know, that was about it.* I told them, see, the day before, I believe it was the same day of the fight—

THE COURT: What fight?

THE WITNESS: They said there was a fight on the same day. I don't remember the same exact date but they said, see, that day of that certain fight that some people were talking about. I was down Neshaminy Park and when I come back, you know, I didn't know nothing about the fight, you know, I just heard Cito was fighting this and this and that and they locked him up and that's it. And later on, see, I was living in the streets during that time with my girlfriend because— ... she didn't have no place to stay. She was out in the streets. Her father had kicked her out of the house, and my mother couldn't have her in the house either, so I had to stay with her in the streets. So at about—I don't even know about what time I came back from the park, I left her over a friend's house. By the time I come back I hear about, you know, a fight and they just locked him up. And we, me and my girlfriend, just started walking around the neighborhood and we sat—we ended up sitting at a church step across the street from where I live at, St. Andrews, but we were sitting on North Street side and, you know, we were just sitting there to kill time because we used to sneak down, you know, our cellars and sleep for the night, you know, make sure everybody in my house would go to sleep first before we snuck down the basement. And while we were doing that, I just seen him [Santiago], I seen him ride by on a bike and he says hi, I say hi. That was about it. That's what I told them.

THE COURT: *What time did you see him ride by?*

THE WITNESS: *It wasn't really dark yet. I'd say it was just about turning dark outside, you know.* I don't recall, you know, any specific time seeing him.

\*　　\*　　\*　　\*　　\*　　\*

THE WITNESS: I would like to mention that Santiago's attorneys came by my house one day and asked me about the statement I had made. *They said that they put down that I seen Santiago around midnight, which I did not say at all;* and they said it was signed by me. I, you know, if I recall, *when I signed that statement I really didn't get a chance to even read it before I signed it because they had me real nervous, you know. They gave me a pretty rough time.* They even put down, tried to say things like, you know, they say you had the gun, they tried to say I had the gun and this and this and that. . . .

\* \* \* \* \* \*

Cito [Santiago], I only know him from playing. When I was younger we used to have a Spanish league baseball league in the community.

THE COURT: You're only 19.

THE WITNESS: Well, when I was younger, a little younger, about 11, 12 years old. Cito was in the league too and, you know, we were on the same team. I only know him from playing sports. He never gave me any trouble. That's all I could say. He never gave me any trouble at all.

THE COURT: *You're not afraid of him?*

THE WITNESS: *No, I'm not afraid of him. To me he's a nice guy. Like any other normal person I knew.*

THE COURT: *Are you afraid of anyone in the community?*

THE WITNESS: In the community?

THE COURT: Yes.

THE WITNESS: Around where I live at, *no, because I grew up around there. Most of the people know my family. We get along well.*

\* \* \* \* \* \*

THE COURT: What you're saying before me is not going to appear in any newspaper. These are secret hearings. That's what the purpose of these hearings is,

so they won't be made public, unless you want them to be made public.

THE WITNESS: It doesn't really matter to me. If they want to come and ask me questions about it—

THE COURT: No questions. I'm talking about newspapers.

THE WITNESS: Yeah, I know that, reporters. I mean I have nothing against because *I have nothing to hide, I have nothing to lie about. And I really,* if I may say so, *I really think they got the wrong person. I don't think he really did it.*

N.T. 5/8/86 at 4–6, 7–8, 11.

By contrast, at trial less than three months later, Rosario testified on direct examination, as follows:

Q. In the recess, that you just had, did you call me aside to tell me that there is something you wanted to get off your chest?

A. Yes.

Q. Would you tell the jury what it is that you told me?

A. I told you that during the pretrial hearing, everything that was on the statement was true.[34] *The only reason why I changed it was I feared Cito* [Santiago] *and that was fear of his family.*

 \* \* \* \* \* \*

BY THE COURT:

Q. What did you testify to on the statement? Unless you want to use the statement to refresh your recollection. I want you to testify based upon your independent recollection.

A. Okay.

Q. As to what the facts were; do you understand that?

A. Yes.

---

**34.** The "statement" Rosario was referring to was apparently a statement to the police in which he claimed he had seen Santiago between 1:00–1:30 a.m. But in this "statement" Rosario had not mentioned seeing Santiago with a gun.

Q. Do not consider the statement, consider exactly what you saw.

A. *Well, my girlfriend and I were sitting on the steps about 1:00 or 1:30* [a.m., on the morning Officer Trench was murdered] in the 1900 North Street [several blocks away from the scene of the crime] *and Cito* [Santiago] *just rode by on the bike* and he was wearing sunglasses and he had a shirt tied around his waist and short pants and a newspaper.

\* \* \* \* \* \*

[BY THE PROSECUTION:]

Q. And at the time he was holding the newspaper was he walking or riding or driving or what?

A. He was riding.

Q. Riding what? What was he riding?

A. A ten-speed bike.

Q. What, if anything, did you see happen?

A. *Cito had dropped the gun right in front of us.*

Q. What did he drop in front of your, Mr. Rosario?

A. *He dropped a gun.*

Q. From where did he drop the gun?

A. *It fell out of the newspaper.*

Q. And what if anything did you see him do?

A. *He stop* [sic] *and picked it up. I was sitting right by him. He picked it up and he got back on the bike and he said hi and he kept going west toward* (inaudible) *Street.*

\* \* \* \* \* \*

Q. Did he drive past you on that bike?

A. Yes.

Q. Did he have the newspaper?

A. Yes.

Q. *And he picked up the gun?*

A. *Yes, he put it back in the newspaper.*

MISS CHRISTIE: Thank you. You may cross-examine.

N.T. 7/24/86 at 140–141, 142–144.

On cross-examination, Rosario held firm. Moreover, on redirect, he explained that the reason he decided to risk perjury by contradicting his earlier sworn testimony was "[b]ecause its just on my conscience because I didn't really know Officer Trench but like I used to go up to the church sometime, you know, and he was a nice man." *Id.* at 161.

That Rosario's trial testimony was injurious to Santiago's defense is incontrovertible. According to Jose Rosario's trial testimony, Santiago was not at home in bed on the night of the murder as Santiago had claimed to the police. *See* N.T. 7/25/86 at 26. Rather, as the Commonwealth reminded the jury during closing, Rosario said that Santiago was "four blocks [away from the murder scene], one hour before [gun] shots were heard, . . . armed with a gun, . . . prowling and stalking around the neighborhood." N.T. 8/4/86 at 90.[35] Other than Rosario, no trial witness testified that Santiago had ever been seen on the morning of the murder, let alone seen with a gun.[36]

Moreover, Rosario stood as the sole witness the Commonwealth offered who claimed to risk perjury charges to tell the "truth." As the Commonwealth articulated in closing,

[a]nd I ask you, what motive, what motive would Rosario, none shown to you, come in to testify to that? What motive would prompt that young man, who had no record—if he did, you would have heard it—what motive would prompt that young man to risk perjury for testifying differently at two prior trials? What motive would

35. The gun shots referred to by the Commonwealth were heard by a resident of the neighborhood in which Officer Trench was killed between 2:15 and 2:30 on the morning of the murder. *See* N.T. 7/18/86 at 41.

36. The Commonwealth's rather fatuous argument that other eyewitnesses placed Santiago near the time and scene of the crime is belied by the record. The only testimony in which other witnesses claimed to have seen Santiago on the night of the crime was unequivocally *recanted* at trial. *See* N.T. 7/24/86 at 126–127 (Statements of Joaquin Cedeno); 7/19/86 at 36–37 (Statements of Joseph Aponte).

prompt that man to come in and say that? Or was it what he told you, that he wanted to get it off his conscience?

*Id.*

In view of the obvious deleterious effect Rosario's trial testimony had on Santiago's defense, the degree to which Santiago was able to impeach Rosario was of pivotal concern. In several significant respects, the undisclosed *in camera* testimony was utterly contradictory to that offered at trial. Review of the record reveals, however, that four additional pre-trial statements were available to the defense which would have served to impeach Rosario with regard to most aspects of his trial testimony.[37] To this extent, the undisclosed *in camera* statements were merely cumulative of other sworn statements already disclosed to the defense and available for use as impeachment material. Such cumulative evidence could not have made the difference between conviction and acquittal.

The question of whether the *in camera* testimony could have been used to impeach Rosario's trial testimony regarding how much he feared Santiago may not be so dismissed. *In camera,* Rosario boasted: that he knew Santiago as a child, that he thought Santiago was a nice guy; that he had nothing to hide; and that he was afraid of neither Santiago nor the community in which he "grew up." *See* N.T. 5/8/86 at 4–6, 7–8, 11. Further, Rosario reassured the judge that rather than having been harassed by the *community,* he had been harassed by the *police. Id.* At trial, however, Rosario explained, "The only reason why I changed it [his

37. On four additional occasions, Rosario had given statements in which he similarly failed to mention that he had seen Santiago with a gun. On two of these occasions, Rosario had been placed under oath. *See* N.T. 7/24/86 at 162 (referring to prior federal hearings); *Id.* at 144–45 (referring to the instant suppression hearings). Moreover, on three of those occasions, including the two in which Rosario was placed under oath, he claimed either to have known nothing about the murder, *see id.* at 162, or to have last seen Santiago no later than 8:00 or 9:00 p.m. on the evening before the murder. *See* N.T. 5/22/86 at 104.

■■■■■■■ .

testimony] was I feared Cito and that was fear of his family." N.T. 7/24/86 at 140.

For the Commonwealth, an explanation as to why Rosario would change his testimony was vital. Testimony that Rosario feared that Santiago's friends or family might seek reprisals, therefore, served the special purpose of allaying concerns as to why Rosario had not been more forthright with such critical evidence earlier in the proceedings. Without it, the question of why Rosario would so blatantly recant his prior testimony might easily have loomed large in the jurors' minds, steadily undermining this key witness' credibility.

Moreover, in view of the painstaking precautions the trial judge took before questioning Rosario *in camera* about the degree to which he feared Santiago might intimidate him if his name were made public, any testimony offered elsewhere with regard to the fear Rosario felt cannot compare with the impeachment qualities of Rosario's *in camera* testimony. The very purpose of the trial court's *in camera* interview with Rosario was to determine the degree to which Rosario feared witness intimidation. Concerned that a simple oath was insufficient to promote Rosario's honesty, the judge not only assured Rosario that his testimony *in camera* would remain in strict confidence, but the judge also took the highly unusual step of excluding even the lawyers from the interview, a decision which precipitated this materiality analysis in the first place.

Considering the extraordinary measures taken to insure the reliability of Rosario's testimony regarding his fear of the community or Santiago himself, we cannot say that the testimony was merely cumulative of testimony given without such assurances. The *in camera* hearings were anomalous in this respect, and may well have offered a powerful tool to the defense for the impeachment of Rosario's entirely inconsistent trial testimony. Moreover, because this particular aspect of Rosario's trial testimony served as essential support for the remainder of his unquestionably devastating trial testimony, we conclude that the failure to

provide the defense an opportunity to impeach Rosario with it undermines our confidence in the verdict. *See United States v. Bagley, supra.* Accordingly, we hold that the undisclosed evidence can only be described as materially exculpatory.

Here, as in *Pennsylvania v. Ritchie, supra,* the trial court owed an ongoing duty to disclose such evidence to the defense once it became clear at trial that such evidence was materially exculpatory. Failure to so disclose such evidence, therefore, was reversible error.

## IV. CONCLUSION

We conclude that for the foregoing reasons, Santiago's right to counsel, as well as his due process right to disclosure of materially exculpatory evidence held by the trial court, were violated during his trial. We hold that each violation, in and of itself, was sufficient to warrant a new trial, and thus, our conclusion is based on alternative grounds.

Judgment of sentence reversed. The case is remanded for a new trial. Jurisdiction relinquished.

JOHNSON, J., concurred in the result of the majority opinion.

POPOVICH, J., filed a dissenting opinion.

POPOVICH, Judge, dissenting:

I dissent to the result reached by the Majority.

First, to the extent that the Majority implies that *Minnick v. Mississippi,* —— U.S. ——, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), is the cornerstone upon which an accused's right to the presence of counsel during questioning following his request for representation rests, I disagree.

*Minnick* does no more than update and endorse the principle enunciated in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that once an accused asserts his right to counsel, the interrogation must cease

until an attorney is present, *and no further questioning may be initiated by the authorities in the absence of counsel.* See Concurring and Dissenting Opinion by Popovich, J., in *Commonwealth v. Santiago,* 376 Pa.Super. 54, 545 A.2d 316 (1988).

However, albeit the action of the police in questioning the Defendant was improper, the information elicited does not, when viewed in the context of the trial as a whole, warrant the grant of a new trial.

I find it difficult to infer from the inconsistencies present in the Defendant's first three statements and the fifth statement about owning and/or possessing a gun prior in time would have been the linch-pin causing the jury to make a leap of logic to conclude, beyond a reasonable doubt, that the Defendant committed the murder. The evidence must be viewed as a whole and not in a vacuum.[1]

The varying versions of the bicycle owned by Eduardo and supposedly sold, traded or loaned to the Defendant for a weapon similar in caliber to that used in the murder lacks that semblance of inculpation making its admission prejudicial so as to warrant the award of a new trial.

In all other regards, the Defendant maintained steadfastly, in his five statements to the police, that he was not involved in or responsible for the shooting death of Officer Thomas Trench. The inclusion of information at trial that the Defendant had obtained the bicycle from someone other than whom he had stated initially had "no real impact on the ultimate disposition" of the case. See *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The more devastating evidence was the account of several witnesses that he had been in possession of a gun on the evening in question. In particular, Rosario testified that he saw the Defendant on the morning of the shooting drop a

---

1. The *falsus in uno falsus in omnibus* axiom is not mandatory but it is up to the trier of fact's discretion to apply it to all of an accused's testimony. I find no evidence that the substance of the Defendant's fifth statement to police could have been detrimental to him when viewing the case in toto.

gun and stop to pick it up as he rode a bicycle in the area of the shooting.

The volume of evidence, although circumstantial, was sufficient to sustain the Defendant's conviction and judgment of sentence. If there were any error in the admission of the Defendant's statements, it was harmless. See *Commonwealth v. Bricker*, 525 Pa. 362, 581 A.2d 147 (1990).

The due process argument put forth by the accused enlists the language of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring the prosecution to disclose exculpatory evidence (favorable evidence to be assessed by the trier of fact). It is a proper vehicle through which a jurist in possession of exculpatory evidence is to disclose such information to permit justice to be exonerated and truth to be the beacon that directs our trek through the criminal justice system.

A defendant is entitled to a fair trial, not a perfect one. To that end, where materially exculpatory evidence is possessed by a member of the prosecution team, as well as a jurist hearing the case, it is to be disclosed without the need of asking for such a disclosure by the defense. Cf. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Brady v. Maryland*, supra.

As for the materiality of the *in camera* testimony not disclosed (in particular, that the witness-Rosario did not fear the Defendant), the defendant's counsel had ample opportunity to impeach the credibility of the witness premised upon his previous recorded statements to the contrary. See Majority Opinion at 105, n. 37. Thus, I find the excluded remarks of Rosario to have been merely a point on a continuum reflective of his credibility subject to attack by means other than the use of the *in camera* questioning engaged in by the trial court.

The jury was presented with sufficient evidence, unmarred by procedural, due process or substantive violations of the type demanding a reversal.

110

Because the Majority holds to the contrary, I respectfully dissent.